**Hayward LAWSON, for Petitioner–Appellant,**

v.

**Aristedes ZAVARAS, Executive Director, Colorado Department of Corrections,for Respondent–Appellee.**

**No. 97SA185.**

Supreme Court of Colorado, En Banc.

Sept. 21, 1998.

Rehearing Denied Oct. 19, 1998.

Paul Grant, Parker, for Petitioner–Appellant.

Gale A. Norton, Attorney General., Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Garth C. Lucero, Deputy Attorney General, Paul S. Sanzo, First Assistant Attorney General, Civil Litigation Section, Inmate Litigation, Denver, for Respondent–Appellee.

Justice MARTINEZ delivered the Opinion of the Court.

The petitioner, Hayward Lawson, filed a petition for writ of habeas corpus in the District Court for the City and County of Denver. The district court denied the petition as premature because the petitioner had not first exhausted other legal remedies. *See Lawson v. Zavaras,* No. 97CV1060 (Denver Dist. Ct. Apr. 2, 1997) (order denying petition). Lawson appeals from this denial. We affirm the trial court's judgment, but on grounds different from those employed by that court.

## I.

We draw the following facts from the petition for writ of habeas corpus and from the parties' briefs. Lawson is currently serving a life sentence for first-degree murder in the Colorado Department of Corrections (DOC). *See People v. Lawson,* 37 Colo.App. 442, 443, 551 P.2d 206, 207 (1976). On September 20, 1995, Lawson was presented by the DOC to the Denver Community Corrections Board for placement in community corrections. The Board accepted Lawson on October 29, 1995, and he was placed in the Denver Sheriff's Department Community Corrections Program, Mountain Parks Work Program, located in the Denver County Jail.

The Mountain Parks Program is a "Phase I" community corrections program which serves as a transition facility for those inmates who are being considered for "Phase II" placement in a private community corrections program. It is customary for inmates to remain in the Sheriff's Mountain Parks Program for a period of time prior to being moved to Phase II. The inmates in the Mountain Parks Program remain in DOC custody, under the supervision of the Denver County Jail. The inmates are allowed to leave the jail to go to work but are required to return to

the jail in the evening and on weekends. While at the Mountain Parks Program, Lawson obtained a job in the community on a work release program.

Lawson was referred to the three private programs under contract with the Denver Community Corrections Board as Phase II facilities. Although he was initially rejected by all three facilities, Lawson was eventually accepted by Independence House. However, Lawson was not immediately transferred to Independence House due to some questions about his parole status. Subsequently, Lawson was rejected by Independence House after its earlier acceptance.[1]

On June 19, 1996, Lawson's case was again presented to the Community Corrections Board, and the Board voted to reject him after acceptance, with the caveat that he may be referred to the Board after the Parole Board sets a parole release date. He was removed from the Mountain Parks Program because he could not be progressed to a Phase II program.[2] The DOC transferred Lawson to the Bent County Correctional Facility.

Lawson filed his petition for writ of habeas corpus in the district court on February 25, 1997. He alleged that his "rejection after acceptance" into community corrections,

"[a]fter nine months of significant liberty in the Denver community, and no problems in the work release program," deprived him of due process, specifically his liberty interests protected by the Fourteenth Amendment and article II, section 25 of the Colorado Constitution.[3] He further claimed that because of these violations he was "entitled to be either (1) released outright, or (2) be placed back into the work release program."

On April 2, 1997, the district court denied the petition on the grounds that

[t]he relief requested is outside the scope of the Habeas Corpus Act and cannot afford the petitioner immediate release. Appeals of department of corrections administrative or placement decisions are brought pursuant to C.R.C.P. 106(a)(2). To issue a writ, at this time would be premature. Before the respondent [sic] can seek a writ of habeas corpus, he must first exhaust his legal remedies.

*Lawson v. Zavaras*, No. 97CV1060 (citations omitted). This appeal followed.

Lawson contends that the district court erred when it denied his petition as premature because of his failure to exhaust other legal remedies, specifically to bring an action under C.R.C.P. 106(a)(2).[4] The respondent,

1. According to the DOC in a letter Lawson attached to his petition for habeas corpus:

    It is customary for inmates to remain in the Sheriff's Program for a period of time prior to being moved to Phase II, one of the three private programs under contract with the Denver Community Corrections Board. Initially, Inmate Lawson was referred to Independence House on September 29, 1995, and they denied his placement in their program. On November 30, 1995, Inmate Lawson was referred to all of the Phase II Programs, Williams Street Center, Alpha Center, and Independence House, and on December 7, 1995, Independence House accepted him (Williams Street Center and Alpha Center rejected him). However, Inmate Lawson was not immediately transferred to Independence House due to some questions about his parole status and ultimately Independence House denied his placement in their program.

2. According to the DOC, the Phase II halfway house would not have rejected Lawson after acceptance if Lawson had a parole date. In his answer brief, the respondent-appellee, who is the executive director of the DOC, asserts that "[o]n March 13, 1996, the Parole Board deferred pa-

role consideration until January 1, 1997. On January 23, 1997, the Parole Board deferred consideration of Lawson's parole until November 1, 1998." Lawson has not disputed this assertion in this court.

3. The petition also alleged violations of the prohibitions against cruel and unusual punishment contained in the Eighth Amendment and article II, section 20 of the state constitution. He does not reassert violations of cruel and unusual punishment in this court and we therefore do not consider those constitutional provisions in this opinion.

4. C.R.C.P. 106(a)(2) provides:

    (a) ... In the following cases relief may be obtained in the district court by appropriate action under the practice prescribed in the Colorado Rules of Civil Procedure:

    . . .

    (2) Where the relief sought is to compel a lower judicial body, governmental body, corporation, board, officer or person to perform an act which the law specially enjoins as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and

while agreeing with the decision to dismiss Lawson's petition, also contends that the district court erred in stating that Lawson may pursue relief under C.R.C.P. 106(a)(2). The respondent states in the answer brief that, "[c]ontrary to the assertion by the District Court, Lawson lacks any right to mandamus under Rule 106(a)(2). The DOC has discretion over placement decisions. The community corrections board has discretion to deny placement in community corrections. Therefore, mandamus is unavailable."

Additionally, Lawson reasserts his substantive claim that his rejection after acceptance into community corrections deprived him of a protected liberty interest without due process of law.

## II.

Because Lawson has not alleged facts which, if proved, provide an adequate basis for finding a constitutional violation, we find it unnecessary to require him to first pursue other legal remedies. Thus, we reach the merits of Lawson's claim and find no due process violation. We affirm the judgment of the trial court.

## A.

The United States Supreme Court has established the standards for evaluating a convicted offender's due process claim. In various contexts, the Court has examined the deprivation of liberty experienced by the offender as well as the minimum due process protections which must accompany the particular deprivation. *See, e.g., Young v. Harper*, 520 U.S. 143, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997) (revocation of preparole); *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (disciplinary segregation within prison); *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (transfer to higher security institution); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (loss of good-time credits); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484

(1972) (revocation of parole). Careful analysis of these cases reveals the Court's approach for considering an offender's due process claim. The Court first determines the gravity of the particular deprivation of liberty. The Court then considers what process, if any, is due the offender in light of the gravity of the deprivation.

The Court's approach has resulted in a continuum, along which the process to which an individual is due varies. At one end of this continuum, the individual will suffer a "grievous loss" of liberty of such a magnitude that the nature of the individual's interest is "one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593. This situation has traditionally included the revocation of parole, *see id.* at 482, 92 S.Ct. 2593, and the revocation of privileges so similar to parole as to be distinguishable in name alone. *See Young*, 117 S.Ct. at 1150. In these cases, the constitutional requirements of the due process apply, and call for "such procedural protections as the particular situation demands." *Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593.

Moving along this continuum, the Court has examined various disciplinary sanctions imposed upon prison inmates. In *Sandin v. Conner*, the Court recently considered a due process claim in this context. *See* 515 U.S. at 476, 115 S.Ct. 2293. In analyzing the claim, the Court declared, "The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.*" *Id.* at 483, 115 S.Ct. 2293. Hence, our inquiry is directed to the due process standards enunciated in *Wolff* and *Meachum.*

*Wolff* concerned an inmate's loss of good time credits under prison regulations that provided for such a loss only in the case of serious misconduct. *See* 418 U.S. at 557, 94 S.Ct. 2963. There, the Court determined that the loss of good time credits, while not on par with the "grievous loss" represented by parole revocation, was nevertheless a matter of "real substance" to the inmate. *See id.*

enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such lower judicial body, govern-

mental body, corporation, board, officer, or person. The judgment shall include any damages sustained....

at 557–60, 94 S.Ct. 2963. Furthermore, the Court found that the state's procedures themselves, because they conditioned the loss of good time upon a showing of serious misconduct, created a liberty interest in the good time credits. Thus, the revocation of the credits implicated due process concerns. *See id.* at 557–58, 94 S.Ct. 2963.

In *Meachum,* the Court held that the transfer of the inmate to a more restrictive institution did not implicate due process concerns because, even assuming that the liberty deprivation was a serious one, the state's policies did not limit its discretion to conduct the transfer. *See* 427 U.S. at 224, 226–27, 96 S.Ct. 2532. Thus, the state policies did not create a liberty interest (within the meaning of the due process clause) in remaining at the less restrictive institution. *See id.*

In *Sandin,* the Court examined the due process claim of an inmate who was sentenced to disciplinary segregation in a "Special Holding Unit." *See* 515 U.S. at 476, 115 S.Ct. 2293. The Court found that, upon the specific facts of that case, the segregation of the inmate did not work a "major disruption in his environment" or constitute a "dramatic departure" from the basic conditions of his sentence. *Id.* at 485–86, 115 S.Ct. 2293. Thus, the Court held the segregated confinement of the inmate "did not present the type of atypical, significant deprivation in which a state could conceivably create a liberty interest." *Id.* at 486, 115 S.Ct. 2293.

█ Considered together, *Wolff, Meachum* and *Sandin* establish that the constitutional protections of due process apply to disciplinary sanctions imposed upon inmates when (1) the deprivation suffered by the inmate is a truly serious one (of "real substance")[5] and (2) relevant state policies condition the imposition of the deprivation on the occurrence of certain well-defined events or facts.

█ With respect to the continuum mentioned above, these cases establish that, where the deprivation of liberty resembles the "grievous loss" described in *Morrissey* and *Young,* the protections of due process apply independently of state law. However, where the deprivation of liberty is substantial but significantly different from that described in *Morrissey* and *Young,* the protections of due process apply only where state policies themselves create a liberty interest. *See Wolff,* 418 U.S. at 557–58, 94 S.Ct. 2963. Finally, where the deprivation is insubstantial or relatively trivial, the requirements of due process are simply not implicated. *See Sandin,* 515 U.S. at 486, 115 S.Ct. 2293.[6] It is within this context that we evaluate Lawson's claim that he was deprived of liberty without due process of law.

**B.**

█ Lawson contends that his rejection, after acceptance, by the Community Corrections Board implicates the constitutional protections of due process. Lawson argues that the policies of this state have created a liberty interest in his placement in community corrections. In accord with Supreme Court precedent, we begin our analysis of Lawson's claim with an inquiry into the substance of his asserted liberty interest. We must decide whether the deprivation suffered by Lawson is one of "real substance" which could conceivably implicate due process concerns. This inquiry concerns the nature of the privileges he was denied by his removal from community corrections.

In general, community corrections programs make use of a variety of different approaches in addressing the educational, vocational, and treatment needs of offenders placed in the programs. *See People v. Hoecher,* 822 P.2d 8, 11 (Colo.1991). For example, a community corrections facility may offer a residential and/or a non-residen-

---

5. In holding that due process protections may also apply to the imposition of solitary confinement, the *Wolff* court characterized such a deprivation as "a major change in the conditions of confinement." *Wolff,* 418 U.S. at 572 n. 19, 94 S.Ct. 2963.

6. *See also id.* at 483, 94 S.Ct. 2963 (citing cases in which the deprivation suffered by the inmate

may be considered insubstantial); *Burgin v. Nix,* 899 F.2d 733, 735 (8th Cir.1990) (finding no liberty interest in receiving a tray lunch rather than a sack lunch); *Lyon v. Farrier,* 727 F.2d 766, 768–69 (8th Cir.1984) (finding no liberty interest in freedom from transfer to a smaller cell without electrical outlets for televisions and liberty interest in prison job).

tial approach. *See id.* at 12–13. In a residential program, the offender is "confined in a very real sense" because "[e]ven if released for work or other rehabilitation activity, such offender would be substantially restricted in his freedom of movement and range of activity and would be duty-bound to return to the community correctional facility each day." *Id.* at 12. In contrast, an offender serving a sentence in a non-residential community corrections program is "not substantially different from an offender paroled from a prison or reformatory." *Id.* An offender in a non-residential program is "free to function in the community in a manner unencumbered by most of the constraints associated with confinement." *Id.* at 13.

After rejection by the Community Corrections Board, Lawson was removed from the Phase I Mountain Parks Program at the Denver County Jail. This program is analogous to a work release program, and does not provide the range of privileges associated with a non-residential program. Therefore, we must determine whether the revocation of the privileges associated with a work release program presents the type of substantial deprivation "in which a state might conceivably create a liberty interest." *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293. We conclude that it does not.

As we explained in *Hoecher,* an offender sentenced to a program that provides only work release privileges cannot be said to be generally free from the incidents of imprisonment. *See* 822 P.2d at 12. The offender is "substantially restricted in his freedom of movement and range of activity." *Id.* The offender may not keep his or her own residence, nor may the offender freely associate with family and friends. The offender is

"confined in a very real sense." *Id.* Indeed, several courts which have encountered claims similar to Lawson's have concluded that a prisoner's work release program does not provide the sort of substantial freedom required to give rise to a protected liberty interest. *See Dominique v. Weld,* 73 F.3d 1156, 1160 (1st Cir.1996); *Callender v. Sioux City Residential Treatment Facility,* 88 F.3d 666, 668–69 (8th Cir.1996); *Logan v. Horn,* 692 A.2d 1157, 1159–60 (Pa.Commw.Ct.1997).

Consequently, we conclude that the removal of Lawson from the Phase I Mountain Parks Work Program did not implicate the requirements of due process.[7] We hold that the deprivation suffered as a result of the return to prison from a work release jail environment is not of sufficient substance to allow the possibility that state procedures might create a protected liberty interest in remaining in the work release program. In light of this conclusion, it is not necessary to engage in an analysis of the statutes and procedures bearing upon Lawson's removal from community corrections.[8]

Accordingly, Lawson's petition for writ of habeas corpus is insufficient to establish a constitutional violation of due process and he is not entitled to the relief requested.

### III.

We affirm the judgment of the district court denying Lawson's petition for writ of habeas corpus.

Justice BENDER does not participate.

---

7. Lawson never experienced the privileges associated with the program at the Phase II Independence House because he was rejected by the program before his transfer was accomplished. Thus, his petition raises only the issue of whether the requirements of due process attached to his removal from the Phase I work release program. We offer no opinion as to the nature of the liberty interest possessed by one participating in the Independence House program.

8. Lawson was transferred from community corrections to the Bent County Correctional Facility pursuant to section 17–27–103(7), 6 C.R.S. (1997). Section 17–27–103(7) provides that an

offender who is rejected after acceptance is entitled to an administrative review process either before the referring agency or the board of community corrections. The limited record before us does not indicate whether such a review process occurred in this case, or what details and standards comprise the review process. Because we conclude that Lawson's interest in the work release program was not of sufficient substance to implicate due process concerns, the details of the review process are not relevant here. Thus, we dispose of Lawson's claimed due process violations without knowing whether he exercised his right to the administrative review process.