[No. 40598-5-I. Division One. March 6, 2000.]

*In the Matter of the Personal Restraint of* SAMUEL F. McNEAL, *Petitioner.*

618

David Bruce Koch of Nielsen, Broman & Associates, P.L.L.C.; and Lindsay Brown, for petitioner.

Christine O. Gregoire, Attorney General, and Donna H. Mullen and Paul Douglas Weisser, Assistants, for respondent.

AGID, J. — This personal restraint petition presents a single issue of first impression in Washington: what level of

due process is required in a community custody revocation hearing. We hold that before an individual's community custody is revoked, he or she is entitled to the procedural protections established for parole revocation hearings in *Morrissey v. Brewer*[1] because the liberty interest of a person in community custody closely resembles that described in *Morrissey* for a parolee. We also hold that the State is not required to permit counsel to participate in community custody revocation hearings.

## FACTS

McNeal filed a personal restraint petition on April 25, 1997, seeking relief from the revocation of his community custody. He has served the time imposed as a result of the revocation, and the case is moot as applied to him because no relief can be provided. But we have previously ruled that the issue is of continuing and substantial public interest and decided to address it. We do so now. Although the issue is moot as applied to McNeal, we briefly recite the facts of his case to provide context for the examination of the question presented.

McNeal received written notice that a disciplinary hearing was scheduled for December 24, 1996, for three violations of the conditions of his community custody. The notice listed the alleged violations and the dates they occurred. McNeal was also given a notice of rights and waiver of hearing form. This notice informed McNeal of his right to a hearing within five days and further advised:

> You have the right to an attorney. Such representation is limited to advising the offender of his/her rights to remain silent and does not include the right to act as an advocate throughout the hearing.

> You have the right to present statements on your own behalf, to ask witnesses to be present, to have access to non-confidential reports, and have staff assistance when necessary

---

[1] 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

Unauthorized persons may be excluded from the hearing.

McNeal and his community corrections officer testified at the hearing. The State asserts that evidence offered included Spokane County Sheriff's reports and Washington State Patrol Laboratory reports. The hearing officer found McNeal guilty of all violations charged and sanctioned him with 300 days of confinement.

In an affidavit attached to his personal restraint petition, McNeal states that at his hearing he asked: (1) to present four witnesses on his own behalf; (2) for counsel to represent him; (3) that the hearing be recorded; and (4) that he be allowed to see the evidence against him. He says all these requests were denied and claims that the hearing was not held as scheduled but several days later, violating his right to a hearing within five days. In a reply to the Department of Correction's (DOC) response, he claims that all the text of the sheriff's reports was omitted and produces copies. The State has presented no evidence that McNeal was allowed to see the text of the reports at the time of the hearing. The record is unclear about the date the hearing took place.

## DISCUSSION

In *Morrissey*,[2] the United States Supreme Court examined the nature of a parolee's liberty interest and established the procedural protections a parolee must get before his or her parole may be terminated. In *Young v. Harper*,[3] the Court ruled that the protections established in *Morrissey* applied to an Oklahoma early-release program that closely resembled parole. In this case, McNeal argues that the liberty interest of an individual in community custody is similar to that of a parolee and therefore a revocation hearing requires the due process protections established in *Morrissey*. But the State argues that under former RCW

[2] 408 U.S. 471.

[3] 520 U.S. 143, 117 S. Ct. 1148, 137 L. Ed. 2d 270 (1997).

9.94A.205(3) (1998)[4] a community custody revocation hearing is treated as "inmate disciplinary proceedings" and thus requires only the lesser due process requirements established for prisoner discipline in *Wolff v. McDonnell*.[5] Alternatively, the State argues that even if *Morrissey* applies to community custody revocation hearings, the defendant is not entitled to counsel and *Morrissey*'s requirements were satisfied in McNeal's case. Before turning to these arguments, we take a brief tour of the statutory provisions surrounding community custody.

A. Statutory Provisions

Community *placement* is a period during which an offender is subject to the conditions of community *custody* and/or postrelease supervision.[6] Community placement begins either upon the completion of the confinement term (postrelease supervision) or when the inmate is transferred to community custody.[7]

Community *custody* is defined in RCW 9.94A.030(4):

> "Community custody" means that portion of an inmate's sentence of confinement in lieu of earned early release time or imposed pursuant to RCW 9.94A.120 (6), (8), or (10) served in the community subject to controls placed on the inmate's movement and activities by the department of corrections.

In RCW 9.94A.120(6)(b), the Legislature requires that a one-year community custody term accompany the special drug offender sentencing alternative. Under subsection (8)(a)(ii)(A), if the offender qualifies for the special sex offender sentencing alternative, the court must place the offender on community custody for the length of a suspended sentence or three years, whichever is greater. Subsection (10)(a) mandates the *addition* of a three-year community

---

[4]All of our cites are to the statutes in effect at the time this case arose; that is the 1998 version.

[5]418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).

[6]RCW 9.94A.030(5).

[7]*Id.*

custody term to the sentence of an offender convicted of a sex offense committed on or after June 6, 1996. Finally, RCW 9.94A.120(9)(a) and (b) require a one- or two-year term of community placement for various categories of offenses, including serious violent offenses. An offender sentenced to a community placement term may also be transferred to community custody in lieu of earned early release.

Community custody is *in lieu of* earned early release. Thus, although an individual sentenced to community custody may earn early release time for good behavior, it does not reduce his or her sentence as normally occurs under RCW 9.94A.150.[8] Rather, the person is transferred to community custody and must serve the remainder of the sentence subject to its conditions.

Mandatory as well as discretionary conditions imposed upon those sentenced to community placement are stated in various provisions, but for those sentenced under RCW 9.94A.120(9) or (10), the mandatory conditions are found in RCW 9.94A.120(9)(b):[9]

> (i) The offender shall report to and be available for contact with the assigned community corrections officer as directed;

> (ii) The offender shall work at department of corrections-approved education, employment, and/or community service;

> (iii) The offender shall not possess or consume controlled substances except pursuant to lawfully issued prescriptions;

> (iv) The offender shall pay supervision fees as determined by the department of corrections;

> (v) The residence location and living arrangements are

---

[8]RCW 9.94A.150(1) provides: "Except as otherwise provided for in subsection (2) of this section, the term of the sentence of an offender committed to a correctional facility operated by the department, may be reduced by earned early release time in accordance with procedures that shall be developed and promulgated by the correctional agency having jurisdiction in which the offender is confined. The earned early release time shall be for good behavior and good performance, as determined by the correctional agency having jurisdiction."

[9]Because community custody is a subset of community placement, these conditions apply to those sentenced to community custody.

subject to the prior approval of the department of corrections during the period of community placement; and

(vi) The offender shall submit to affirmative acts necessary to monitor compliance with the orders of the court as required by the department.

The discretionary conditions are listed in RCW 9.94A-.120(9)(c):

(i) The offender shall remain within, or outside of, a specified geographical boundary;

(ii) The offender shall not have direct or indirect contact with the victim of the crime or a specified class of individuals;

(iii) The offender shall participate in crime-related treatment or counseling services;

(iv) The offender shall not consume alcohol;

(v) The offender shall comply with any crime-related prohibitions; or

(vi) For an offender convicted of a felony sex offense against a minor victim after June 6, 1996, the offender shall comply with any terms and conditions of community placement imposed by the department of corrections relating to contact between the sex offender and a minor victim or a child of similar age or circumstance as a previous victim.

RCW 9.94A.205 addresses violations of conditions imposed on those in community custody:

(1) If an inmate violates any condition or requirement of community custody, the department [of corrections] may transfer the inmate to a more restrictive confinement status to serve up to the remaining portion of the sentence, less credit for any period actually spent in community custody or in detention awaiting disposition of an alleged violation and subject to the limitations of subsection (2) of this section.[10]

. . . .

(3) If an inmate is accused of violating any condition or

---

[10]Subsection (2) applies to sex offenders in community custody.

requirement of community custody, he or she is entitled to a hearing before the department prior to the imposition of sanctions. *The hearing shall be considered as inmate disciplinary proceedings* and shall not be subject to chapter 34.05 RCW.[11] The department shall develop hearing procedures and sanctions.[12]

Procedures for prison discipline appear in chapter 137-28 WAC.

B. RCW 9.94A.205(3) Does Not Limit the Due Process Required for Community Custody Revocation Hearings

The State asserts that under the plain language of RCW 9.94A.205(3)—"[t]he hearing shall be considered as inmate disciplinary proceedings"—a community custody revocation is to be treated as a prison disciplinary proceeding. It argues that the Legislature did not intend to give individuals in community custody the same liberty interest as individuals on parole. Thus, the State argues, a community custody revocation hearing requires only the procedural protections established in *Wolff*[13] for prison disciplinary proceedings.

In further support of this contention, the State points to the Legislature's choice to define community custody in terms of an *inmate's* sentence, which is *served* in the community. By statute, inmates are those committed to the custody of DOC and include not only the full-time residents of correctional institutions but also those "released on furlough, work release, or community custody."[14] Thus, al-

---

[11]The Administrative Procedure Act.

[12](Emphasis and footnotes added.)

[13]418 U.S. 539.

[14]RCW 72.09.015(11). The Legislature has labeled individuals in community custody as "inmates" even though the traditional definition of inmate includes only those in total confinement. BLACK's defines inmate as a "person confined in a prison, hospital, or other institution." BLACK's LAW DICTIONARY 791 (7th ed. 1999). WEBSTER's defines inmate as "a person confined or kept in an institution (as an asylum, prison, or poorhouse)." WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 1165 (1986).

though living in the community, those in community custody are still "inmates."

Finally, the State finds support in the Legislature's separate treatment of community custody violations. RCW 9.94A.200 provides for noncompliance with conditions or requirements of sentences generally. The court may impose further punishment for violations, and the State has the burden of proving noncompliance by a preponderance of the evidence.[15] In contrast, the Legislature provided specifically for community custody violations in RCW 9.94A.205. There is no mention of court involvement. Rather, DOC holds the hearing and determines and imposes sanctions.[16]

We agree with McNeal that while RCW 9.94A.205(3) grants authority to DOC to carry out the hearing and impose sanctions, it does not authorize DOC to afford less due process than is constitutionally required. McNeal also points to the Legislature's directive to DOC that it develop hearing procedures and sanctions.[17] Because procedures for prison discipline were already in place,[18] this last directive would be unnecessary if the Legislature intended that the same due process protections apply to community custody revocation hearings.

■ We conclude that, although the Legislature clearly meant to characterize community custody revocation hearings as inmate disciplinary proceedings, giving DOC authority to conduct the hearings and impose sanctions on individuals who are still in fact in DOC custody, the Legislature did not intend that DOC afford less process than is constitutionally required. The Legislature specifically directed DOC to develop procedures. Presumably, it intended that those procedures comply with constitutional requirements.

We must reject the State's argument that *Wolff* controls

---

[15]RCW 9.94A.200(1) and (3)(c).

[16]RCW 9.94A.205(3).

[17]*Id.*

[18]Chapter 137-28 WAC.

here. Characterizing a community custody revocation hearing as an inmate disciplinary proceeding does not, in and of itself, determine the level of due process. Although the Legislature classifies a person in community custody as an inmate because he or she is still in DOC's "custody," the individual is not an inmate in the traditional sense of being in confinement. While *Wolff* held that fewer procedural protections were required for prisoner discipline, there is no indication that the Supreme Court even considered the interests of anyone other than those in *total* confinement.[19] Rather, the Court examined the private interest at stake specifically in terms of those in total confinement. For example, the deprivation that a prisoner faces—primarily the loss of good time—does not immediately change the condition of the prisoner's liberty and is not certain to postpone his or her release because good time may be restored. The Court contrasted the prisoner's deprivations with the "grievous loss" suffered by the parolee or probationer when conditional liberty is revoked.[20] And the "major consideration militating against adopting [for inmates] the full range of procedures suggested by *Morrissey* for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing."[21]

The *Wolff* Court was especially sensitive to the interests of the state in maintaining order and safety in a prison environment. For example, when discussing a prisoner's right to call witnesses, most of whom would be prisoners or prison authorities, the Court considered the tensions between inmates, and between inmates and prison authorities, and the disruption calling them could cause. In contrast, the procedures afforded parolees or probationers "do not themselves threaten other important state interests, parole officers, the police, or witnesses—at least no

[19]*See generally* 418 U.S. 539.

[20]*Wolff*, 418 U.S. at 560.

[21]*Id.* at 561.

more so than in the case of the ordinary criminal trial."[22] This is because the witnesses that an individual in community custody will seek to call are more likely to come from the community.

 What process is due depends on the nature of the governmental function and the private interest affected.[23] If the Legislature creates varying classes of inmates who have differing liberty interests, DOC must develop procedural protections appropriate to the interests at stake for each class. Thus, the Legislature's directive in RCW 9.94A-.205(3) does not answer our question and we must, in the context of *Morrissey* and *Young*, determine whether the liberty interest of one in community custody more closely resembles that of a parolee or of an inmate. To answer this question, we turn first to an examination of the *Morrissey* Court's discussion of the nature of a parolee's liberty interest.

C. The Parolee's Liberty Interest and Due Process Requirements Under *Morrissey*

*Morrissey* held that the Fourteenth Amendment requires the state to afford a parolee due process before revoking parole.[24] Regarding the nature of a parolee's interest in continued liberty, the Court stated:

> The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. . . . Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life.

---

[22]*Id.*

[23]*Morrissey*, 408 U.S. at 481; *see also Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) ("More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.").

[24]408 U.S. at 482.

Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions.

. . . .

We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others.[25]

In determining what process is due, the Court recognized that the state has an "overwhelming" interest in returning a parolee to prison without the burdens of a trial-like hearing for violating parole conditions.[26] What is needed is an informal hearing structured to assure that a parole violation finding will be based on verified facts and that the exercise of discretion will be informed by accurate knowledge of the parolee's behavior. Due process requires a preliminary probable cause hearing and a revocation hearing.[27] The minimum due process requirements include:

(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or

---

[25]*Id.* (footnotes omitted).

[26]*Id.* at 483.

[27]*Id.* at 483-87.

lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.[28]

The *Morrissey* Court explicitly stated that it did not reach the question whether a parolee is entitled to the assistance of retained or appointed counsel.[29]

### D. Morrissey Applies to Early-Release Programs That Resemble Parole

In *Young v. Harper*,[30] the Supreme Court held that an individual conditionally released from prison in an early-release program closely resembling parole is entitled to the procedural protections established in *Morrissey*. Oklahoma operated two programs under which prisoners could be released before their sentences expired: parole and the Preparole Conditional Supervision Program. The purpose of the preparole program was to reduce overcrowding, and it went into effect whenever the prison population exceeded 95 percent of its capacity.

The *Young* Court first looked to the nature of parole: " 'The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence.' "[31] The Court noted that *Morrissey*'s description of a parolee's interest in continued liberty—the ability to be employed, be with family and friends, and to lead a relatively normal life—was equally applicable to an individual released under Oklahoma's preparole program.[32]

The Court rejected the state's attempts to distinguish the two programs. The state first argued that the programs had different purposes: the preparole program was designed to reduce prison overcrowding while parole was to help

[28]*Id.* at 489; *In re Personal Restraint of Boone*, 103 Wn.2d 224, 231, 691 P.2d 964 (1984).

[29]408 U.S. at 489.

[30]520 U.S. 143, 147, 117 S. Ct. 1148, 137 L. Ed. 2d 270 (1997).

[31]*Id.* (quoting *Morrissey*, 408 U.S. at 477).

[32]*Young*, 520 U.S. at 147-48.

reintegrate the inmate into society. The Court found this difference unsupportable because Oklahoma statute provided that parole could also be used to reduce prison overcrowding and the preparole program required its participants to work or attend school, indicating a concern for reintegration into the community.

The state also argued that released preparolees remained in the custody of DOC, but parolees did not, and preparolees were subject to DOC disciplinary proceedings in the event of a violation of conditions. But the Court noted that both were required to report regularly to their parole officers and were subject to the custody of DOC in the event of a condition or parole violation. Thus, one group was as much "in custody" as the other. Another difference the state pointed to was that parolees who "escaped" were not subject to further prosecution but only to revocation of parole, while an escaped preparolee was subject to prosecution as a prison escapee. But the Court rejected this argument as well. "That the punishment for failure to abide by one of the conditions of his liberty was potentially greater for a preparolee than for a parolee did not itself diminish that liberty."[33]

After examining the similarities between the preparole program and parole, the *Young* Court concluded that the preparole program was a kind of parole. Thus, before their conditional liberty could be revoked, preparolees were entitled to the protections that the *Morrissey* Court provided for parolees.

E. The Liberty Interest of an Individual in Community Custody Closely Resembles That of the Parolee

■ There are several reasons why an individual in community custody must be afforded the procedural protections established in *Morrissey* before his or her conditional liberty may be terminated. First, *Morrissey*'s description of a parolee's interest in continued liberty—the ability to be employed, be with family and friends, and to lead a

---

[33]*Id.* at 152.

relatively normal life—is equally applicable to an individual in community custody. Again, the "essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence."[34] Community custody is also a release from prison, and where it is in lieu of earned early release, possibly before the completion of the total confinement sentence.

Second, the *Morrissey* procedures do not interfere with the State's interests. The State has not explained, nor is it evident, how its interests in punishment and returning an individual to confinement if he or she violates a condition of community custody is harmed by affording the *Morrissey* protections.

Third, the State argues that the additional *Morrissey* procedures will burden it because the hearings may take place in jails. Thus, security and logistical concerns militate against permitting witnesses into a jail's secure environment. But, as the *Wolff* Court discussed, the potential security problems result primarily from *who* the witnesses are because disruption arises from other inmates or guards providing evidence for or against the inmate charged.[35] In community custody revocation hearings, as in parole revocation hearings, the witnesses will come primarily from the community. Finally, to the extent there are additional security and logistical burdens on the State from the *Morrissey* protections, they are outweighed by the significant liberty interest at stake.

We reject the State's arguments that community custody is not like parole because the differences the State raises do not affect that liberty interest. The first difference the State points to is that community placement is a punishment and is imposed in *addition* to the period of confine-

---

[34]*Morrissey*, 408 U.S. at 477.

[35]418 U.S. at 562.

ment.[36] Parole and probation, on the other hand, occur *in lieu of* confinement. In *Ross*, the state asserted that a plea was valid even though the court did not inform the defendant that one year of community placement would be added to his sentence. The court rejected the state's argument that community placement was analogous to probation or parole rather than a sentence enhancement. "The State's theory ignores the fundamental distinction between community placement and the related effects of probation and parole: Community placement occurs in addition to the period of confinement, while probation and parole occur in lieu of confinement."[37]

But the focus of the *Ross* court was different from the factors we must examine here. It was looking at the right of a defendant to be informed of his sentence. In determining whether *Morrissey* applies, we must compare the *liberty interest* of the individual in community custody with that of a parolee. The fact that community placement is punishment in addition to a defendant's term of confinement does not change the nature of the liberty interest of the individual in community custody or distinguish it from that of the parolee.

The State also argues that community custody has a different purpose from parole. The purpose of parole is generally rehabilitative, to help reintegrate the inmate into society.[38] The Washington Supreme Court has rejected the premise that community placement is rehabilitative and regulatory.[39] The purpose of community placement is primarily punitive.[40]

But, again, the nature of the individual's liberty interest is not altered because the State now has a different primary purpose for community custody than it had for pa-

[36]*State v. Ross*, 129 Wn.2d 279, 286, 916 P.2d 405 (1996).

[37]*Id.*

[38]*Young*, 520 U.S. at 149.

[39]*Ross*, 129 Wn.2d at 286.

[40]*Id.*

role. Just as the *Young* Court found rehabilitative goals in the Oklahoma preparole program,[41] so we conclude here that although community custody is *primarily* punitive, it also has some rehabilitative aspects. An individual in community custody, like the parolee, is normally required to participate in education, employment, or community service.

The State also argues that the inmate, unlike the parolee, is still in the custody of DOC. But, like the *Young* Court, we reject this argument as a distinction without a difference.[42] We recognize that one of our cases observes that a "defendant is no less restricted when he is under community placement, particularly community custody, as when incarcerated."[43] But here we are concerned with the liberty interest of a person in the community, one who is not behind bars. Once an individual is released from prison confinement into community custody and able to be with family and friends, be employed or attend school and live a relatively normal life, that person's interest in remaining in the community is the same as a parolee's.

Finally, courts of other jurisdictions have also held that the *Morrissey* due process protections apply to community custody revocation hearings.[44]

We emphasize that our holding here is limited to community custody revocation hearings and does not apply to programs like work release, halfway houses and other programs where the inmate remains confined in part in a state facility. We note with approval a line of cases that distinguish situations in which an individual's liberty inter-

[41]520 U.S. at 148-49.

[42]*Id.* at 150.

[43]*In re Personal Restraint of Caudle*, 71 Wn. App. 679, 683, 863 P.2d 570 (1993) (Sweeney, J., concurring).

[44]*See, e.g., Cox v. State*, 706 N.E.2d 547, 549 (Ind. 1999) (the due process requirements for probation revocations apply to revocation of community corrections placement); *Bentley v. State*, 938 S.W.2d 706, 714 (Tenn. Crim. App. 1996) (community corrections and probation closely resemble each other and require the same revocation procedures).

est is insufficient to invoke *Morrissey*'s due process protections.[45]

## F. Due Process Does Not Require Representation by Counsel

In *Gagnon v. Scarpelli*,[46] the United States Supreme Court held that although probationers and parolees do not have an absolute due process right to appointed counsel in a revocation hearing, the "need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system." McNeal asks us to extend *Scarpelli* to community custody hearings. He argues that because the liberty interest of an individual in community custody is similar to that of a parolee, an individual facing a community custody revocation hearing is entitled to counsel on a case-by-case basis at the discretion of the appropriate authority. We disagree because, at this juncture, the distinction between the goals of parole and community custody we discussed earlier in this opinion becomes critical.

■ The focus of the *Scarpelli* opinion is on the rehabilitative goal of probation and parole. Parole officers, who are normally concerned with successfully rehabilitating the parolee within the community, sometimes nevertheless recommend that parole be revoked.[47] When this happens, the parole officer is no longer the parolee's advocate and advi-

---

[45]*See, e.g., Asquith v. Department of Corrections*, 186 F.3d 407, 411 (3d Cir. 1999) (distinguishing *Young* and *Morrissey* and holding in a suit under 42 U.S.C. § 1983 that an individual did not have a liberty interest in continuing participation in a highly regulated and restrictive work-release program); *Lawson v. Zavaras*, 966 P.2d 581, 586 (Colo. 1998) (distinguishing residential from non-residential programs and holding that a prisoner work-release program did not provide the substantial freedom required to give rise to a protected liberty interest); *Carter v. McCaleb*, 29 F. Supp. 2d 423, 428 (W.D. Mich. 1998) (another section 1983 suit distinguishing a work-release program from the preparole program in *Young* because the work-release participant did not keep his own residence, was imprisoned during nonwork hours, and was not free from the incidents of prison life).

[46]411 U.S. 778, 790, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973).

[47]*Scarpelli*, 411 U.S. at 785.

sor. He or she becomes an adversary during the revocation process, and counsel is needed to insure that the rehabilitation effort is not interrupted unnecessarily.[48] Because the focus of the hearing is often on the extent of and future potential for rehabilitation, counsel may be necessary to advocate for the parolee. But as we noted above, our Supreme Court had held that community custody, despite some rehabilitative adjuncts, is primarily punitive in nature.[49] Absent the rehabilitative goal of probation and parole, the rationale of *Scarpelli* does not apply. And the burden on the State of providing counsel, including delay in and formalization of the hearings, the added expense and the administrative burden, override the marginal value counsel would provide at these in-custody hearings.[50] The decision to revoke community custody is based primarily on factual determinations about whether the individual violated the conditions of community custody. The success or failure of the rehabilitative process is not even a factor. Thus, we conclude that the *Morrissey* requirements are sufficient to protect against a wrongful revocation of community custody and hold that the State is not required to provide counsel to participate in community custody revocation hearings beyond the level authorized by current statutes and regulations.

G. McNeal Was Not Afforded the Due Process Protections Established in *Morrissey*

The State argues that even if *Morrissey* applies, McNeal was afforded those due process protections. We disagree. McNeal did not get a copy of the sheriff's report or have the opportunity to present witnesses. The State asserts that he was afforded the right to present witnesses because he could have submitted his witnesses' statements by affidavit, and he simply failed to take advantage of his rights. But *Morrissey* does not limit the right to present witnesses

[48]*Id.* at 785-86.

[49]*Ross*, 129 Wn.2d at 286.

[50]*Morrissey*, 408 U.S. at 481; *Mathews*, 424 U.S. at 334-35.

to submission of written statements, and the notification of the rights the State gave McNeal stated that he had the right to ask witnesses to be *present*.[51] Finally, we agree with McNeal that the notice of rights form given to him does not adequately explain the rights to which an individual is entitled at a community custody revocation hearing. We order DOC to develop procedures and a form of notice that is consistent with this opinion and *Morrissey*.

## CONCLUSION

We hold that an individual facing community custody revocation is entitled to the procedural protections established in *Morrissey*, but counsel is not required. Because McNeal's hearing did not comply with *Morrissey*, the personal restraint petition is granted.

KENNEDY, C.J., concurs.

WEBSTER, J. (dissenting in part) — I dissent with part F of the opinion because the majority misinterprets *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973), and fails to recognize that due process requires counsel in certain community custody revocation hearings. I would hold that *Scarpelli* applies to community custody revocation hearings and that the need for counsel must be made on a case-by-case basis in the exercise of the sound discretion of the appropriate DOC decision maker.

In performing the balancing required by a due process analysis, the *Scarpelli* court takes as its starting point the rehabilitative goals of probation and parole. 411 U.S. at 783. The Court recognized that where the parole officer recommends revocation of parole, a position at odds with that of the parolee, due process requires that the conflict

---

[51]McNeal also argues on appeal that he was denied his right to confront and cross-examine adverse witnesses, but it does not appear from the record that he made that request at the hearing. Under *Morrissey*, this right is discretionary with the hearing officer who may deny the request for a specific witness for good cause. 408 U.S. at 489.

be resolved before revocation is final. *See id.* at 785. All parties have interests in the "accurate finding of fact and the informed use of discretion—the probationer or parolee to insure that his liberty is not unjustifiably taken away and the State to make certain that it is neither unnecessarily interrupting a successful effort at rehabilitation nor imprudently prejudicing the safety of the community." *Id.* at 785. It was to serve all of these interests that the *Morrissey* protections were established. *See id.* at 786 (citing *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)).

The state argued in *Scarpelli* that counsel was not required at parole revocation hearings because the *Morrissey* protections were sufficient to safeguard these interests. The Court disagreed:

> What this argument overlooks is that the effectiveness of the rights guaranteed by *Morrissey* may in some circumstances depend on the use of skills which the probationer or parolee is unlikely to possess. Despite the informal nature of the proceedings and the absence of technical rules of procedure or evidence, the unskilled or uneducated probationer or parolee may well have difficulty in presenting his version of a disputed set of facts where the presentation requires the examining or cross-examining of witnesses or the offering or dissecting of complex documentary evidence.

*Scarpelli*, 411 U.S. at 786-87. It was for this reason, the risk that in some cases the *Morrissey* protections would be ineffective in the absence of counsel, that the Court determined that due process required counsel in those cases.

I submit that this same risk is present in community custody revocations. The "unskilled or uneducated" individual in community custody may no doubt have difficulty in presenting his version of disputed facts where it requires the examination or cross-examination of witnesses or presentation of documentary evidence.

Furthermore, as McNeal argues, the fact that community custody is primarily punitive rather than rehabilitative supports a finding that due process requires counsel in certain cases. The risk of an erroneous deprivation of a lib-

erty interest is *less* likely in a system operating with the goals of the parolee's rehabilitation and reintegration into society than it is in a system operating with punitive goals. Thus, the need for counsel in certain cases is heightened rather than diminished by the punitive nature of community custody.

In its argument against the requirement of counsel, the State asserts its important interests in efficiency. The State undoubtedly correctly predicts that proceedings in which counsel is required will become adversarial and prolonged, and the State will bear the cost of its own counsel and the cost of appointed counsel. But application of *Scarpelli* here would not require counsel in every case. In balancing the interests at stake, the Court declined to find that counsel was required in *all* cases precisely because "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Scarpelli*, 411 U.S. at 787. The Court recognized the costs to the State: "the decisionmaking process will be prolonged, and the financial cost to the State—for appointed counsel, counsel for the State, a longer record, and the possibility of judicial review—will not be insubstantial." *Id.* at 788. Indeed, the Supreme Court noted that "the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings." *Id.* at 790. Thus, the delay and expense here would arise only in those cases where the DOC itself decides that due process requires counsel. Admittedly, the costs of judicial review would add unavoidable State expense.

Although application of *Scarpelli* does not provide a bright-line rule for the DOC to follow,[52] I would hold that, at a minimum, an individual facing community custody re-

---

[52]The Supreme Court provided the following guidelines:

Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is

vocation must be informed of a right to request counsel, and if such a request is made, the DOC decision maker must consider that request, and grounds for refusal must be stated in the record. If the request for counsel is granted, counsel is limited to representation within the context of the type of hearing provided in *Morrissey* but is not limited to advising on the individual's right to remain silent. Although in Washington probationers and parolees have a statutory right to representation of counsel at probation and parole revocation hearings,[53] these statutorily provided rights would not apply to individuals in community custody.

Although the purposes of parole and community custody differ, the focus in a due process analysis is on the nature of the liberty interest at stake, not on the underlying purpose of that interest. Thus, I respectfully dissent with part F only of the majority opinion.

---

uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present. In passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself. In every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record.

*Scarpelli,* 411 U.S. at 790-91.

[53]CrR 7.5(b) entitles a probationer to representation by counsel and requires appointment of counsel for indigent probationers in probation revocation hearings. RCW 9.95.122 provides the right to representation of counsel at the parolee's expense at parole revocation hearings and provides that upon request and proof of indigency counsel may be appointed.