240 P.3d 188 (2010)
In re Personal Restraint Petition of Bruce Deymon PRICE, Petitioner.
No. 37753-5-II.
Court of Appeals of Washington, Division 2.
September 28, 2010.
*190 Sheri Lynn Arnold, Attorney at Law, Tacoma, WA, for Petitioner.
Bruce Deyman Price, Tacoma, WA, pro se.
Donna H. Mullen, Attorney at Law, Attorney General Ofc., Olympia, WA, for Respondent.
PENOYAR, C.J.
¶ 1 In a personal restraint petition, Bruce Deymon Price challenges the Department of Corrections' (DOC) revocation of his drug offender sentencing alternative[1] (DOSA) sentences. The DOC revoked Price's DOSA sentences after he assaulted and harassed his girl friend while serving the community custody portion of his DOSA sentences, which the trial court had previously imposed for other convictions. Price argues that (1) the DOC violated his due process right to confront adverse witnesses at his revocation hearing; (2) the State failed to appoint counsel to represent him at the revocation hearing; (3) the evidence was insufficient to support the violations that led to the DOSA revocations; (4) the DOC lacked authority to revoke his DOSA sentences; (5) the DOC hearing officer could not find that he failed to "obey all laws" because he was not charged with or convicted of any crime; (6) the DOC hearing officer failed to consider lesser sanctions; and (7) cumulative error deprived him of his right to a fair trial. We deny Price's petition.

FACTS
¶ 2 On January 10, 2006, Price pleaded guilty to unlawful possession of a controlled substance (cocaine) with intent to deliver, attempting to elude a pursuing police vehicle, second degree escape, and resisting arrest.[2] *191 The trial court imposed DOSA sentences for all but one of these convictions.[3]
¶ 3 In May 2007, Price completed the in-custody portion of his DOSA sentences and the DOC released him into community custody. One community custody condition required Price to "obey all laws." Resp't's Ex. 1, Attach. D at 1.
¶ 4 On September 17, 2007, Price's community corrections officer (CCO) charged Price with four community custody violations based on his failure to obey all laws. The first violation related to Price's alleged assault of his girl friend Vanessa Campeau on August 19. The second violation involved an alleged harassment incident against Campeau later that same day. The DOC hearing officer later found Price "[n]ot guilty"[4] of a third and a fourth violation, and they are not at issue here.
¶ 5 On September 20, the DOC served Price with a written notice of the allegations, Price's hearing rights, and the violation hearing date. The notice included a list of the evidence that the DOC planned to present at the hearing. Price signed the notice.
¶ 6 On October 3, a DOC hearing officer conducted the violation hearing. The hearing officer found that the DOC had properly served Price with the written notice and that Price had received copies of all adverse documentary evidence. Price pleaded not guilty to each alleged violation.

I. First Alleged ViolationAssault
¶ 7 Price's CCO alleged that Price assaulted Campeau outside a casino in the early morning hours of August 19. The DOC hearing officer considered (1) the police incident reports and accompanying written statements from Campeau and the casino security officer, (2) Price's CCO's telephonic testimony, (3) Campeau's telephonic testimony, and (4) Price's testimony.
¶ 8 The police incident report stated that in the early morning hours of August 19, police officers responded to an incident at a casino. The officers spoke to Campeau and to a casino security officer. Campeau told the police officers that Price had ripped her bra off during an argument. The officers photographed abrasions on Campeau's hands. The casino security officer told the police officers that he saw Price grab Campeau by her shirt, slam her against a wall, and try to throw her to the ground. Campeau and the security officer also provided handwritten statements consistent with their reported statements to the police.
¶ 9 Price's CCO testified that she reviewed a video of the incident. The video did not show the altercation, but it showed casino security guards coming to Campeau's assistance as Price walked away from the area.
¶ 10 Campeau testified at Price's request and stated that Price did not slam her against the wall or attempt to throw her to the ground. Campeau stated that she and Price got into a "short argument" after leaving the casino. Violation Hearing (Oct. 3, 2007) at 14. Campeau testified, "I was just trying to go my own separate way and I started to run off and he grabbed my shirt, but that was it." Violation Hearing (Oct. 3, 2007) at 14. Price denied striking Campeau.

II. Second Alleged ViolationHarassment
¶ 11 Price's CCO also alleged that Price harassed Campeau later that same morning at her mother's house. The hearing officer considered (1) the police incident report and Campeau's accompanying written statement, *192 (2) Campeau's telephonic testimony, and (3) Price's testimony.
¶ 12 The police incident report stated that police officers contacted Campeau about a domestic dispute around 10:00 a.m. on August 19. Campeau told the officers that, after leaving the casino, she picked up her children and took them to her mother's house. Campeau discovered Price inside her mother's home, and Campeau and Price argued. Campeau's mother intervened and locked herself, Campeau, and the two children in Campeau's mother's bedroom in order to avoid Price. They eventually fell asleep, staying in the bedroom until about 7:00 a.m.
¶ 13 According to the incident report, when Campeau emerged from the bedroom, she and Price resumed arguing, and Price insisted that she return with him to Olympia. Campeau felt threatened by Price's demand and hid her car keys. This angered Price, who stated, "I'm gonna show you what the fuck I'm gonna do." Resp't's Ex. 1, Attach. I at 4. Campeau's 10- and 6-year-old daughters left the room to call 911. Price then picked up a serrated knife with a 5-inch blade, "began waving it around," and yelled at the children not to call 911. Resp't's Ex. 1, Attach. I at 2. Price threatened to slash Campeau's car's tires. Campeau called 911, and Price put down the knife and fled. Campeau's handwritten statement contained details similar to the police report.
¶ 14 At the hearing, Campeau admitted she that had called the police but stated that "it wasn't necessary." Violation Hearing (Oct. 3, 2007) at 15. She testified that "[Price] and I were having a disagreement and he didn't want me to just leave ... he wasn't ... preventing me, he just wanted to talk it out." Violation Hearing (Oct. 3, 2007) at 16. Campeau also testified that she slept in her mother's bedroom because she did not want to talk to Price and that she hid her keys. Campeau admitted that she saw a knife, but she testified, "[I]t wasn't aimed towards me." Violation Hearing (Oct. 3, 2007) at 17. Campeau testified that Price did not harass or threaten anybody. Price admitted that he had been in the house, but he denied threatening or harassing Campeau.

III. Hearing Officer's Decision
¶ 15 The DOC hearing officer found Price guilty of the first two violations. For the first violation, the hearing officer stated in her report: "I found Mr. Price guilty based on the testimony of Ms. Campeau that he did grab her when she tried to leave. While she down played [sic] the entire event, her description in many ways corroborates the statement of the security people." Resp't's Ex. 1, Attach. G at 3.[5] For the second violation, the hearing officer stated:
I found Mr. Price guilty based on the testimony of the victim, which was only subtly different than the police report. The points of agreement are: a disagreement ensued, a knife was at least brandished, the family slept in the master bedroom away from Mr. Price, the police were summoned, and Mr. Price was gone when they arrived.
Resp't's Ex. 1, Attach. G at 3.
¶ 16 During the sanction phase, the presenting CCO[6] reported that Price had been "totally compliant and consistent with reporting" before these incidents and that he had successfully completed chemical dependency treatment. Resp't's Ex. 1, Attach. G at 4. She also noted that four separate police reports in Price's file documented "domestic violence related incidents" with Campeau. Resp't's Ex. 1, Attach. G at 4. The supervising CCO recommended revocation of Price's DOSA sentences. Price noted that he had a "pending domestic violence charge" for the August 19 incidents and that he had "[gotten] himself in a bad situation," but he requested another chance. Resp't's Ex. 1, Attach. G at 4.
¶ 17 The hearing officer revoked Price's DOSA sentences, stating, "I consider him an eminent [sic] threat to Ms. Campeau's safety. *193 Although he has complied with supervision up until this incident, he took no responsibility for his behavior, and showed no remorse." Resp't's Ex. 1, Attach. G at 5. The DOC Regional Appeals Panel denied Price's appeal.[7]
¶ 18 On April 24, 2008, Price filed a personal restraint petition with this court. After the DOC filed a response, the acting chief judge referred the petition to a panel of judges for determination on the merits. See RAP 16.11(b).

ANALYSIS
¶ 19 Price argues that he is unlawfully restrained as a result of the DOC's decision to revoke his DOSA sentences and return him to prison. See RAP 16.4(a). A personal restraint petitioner may obtain relief by demonstrating a constitutional violation or a violation of Washington State laws. See RAP 16.4(c)(2), (6). We hold that the State's restraint of Price is lawful.

I. Due Process
¶ 20 Price argues that the DOC failed to provide him with procedural due process at his violation hearing. Specifically, he contends that the DOC denied him the right to confront adverse witnesses and the right to appointed counsel. We disagree.
¶ 21 The State may not deprive an individual of liberty without due process of law. U.S. Const. amend. XIV, § 1; Wash. Const. art. I, § 3. To determine what process is due in a particular situation, we must consider (1) the individual's liberty interest, (2) the value of specific procedural safeguards in protecting against erroneous deprivation of that interest, and (3) the State's interest, including fiscal and administrative burdens of specific procedures. In re Pers. Restraint of Bush, 164 Wash.2d 697, 705, 193 P.3d 103 (2008) (citing Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).
¶ 22 The parties agree that Price had the same liberty interest as a parolee while serving the community custody portion of his DOSA sentences. As the United States Supreme Court explained, an individual on parole can be "gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Accordingly, because ending parole "inflicts a `grievous loss' on the parolee and often on others," a final determination to revoke parole must include the following due process protections:
(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.
Morrissey, 408 U.S. at 482, 489, 92 S.Ct. 2593; accord In re Pers. Restraint of McNeal, 99 Wash.App. 617, 630, 994 P.2d 890 (2000) (requiring Morrissey's due process protections at community custody revocation hearings).
¶ 23 An offender's due process right to confront and cross-examine witnesses is not absolute. State v. Dahl, 139 Wash.2d 678, 686, 990 P.2d 396 (1999). Hearsay evidence, however, should be considered only if good cause exists to forgo live testimony by the declarant. Dahl, 139 Wash.2d at 686, 990 P.2d 396. Additionally, a violation of an offender's minimal due process right to confrontation may be harmless error. Dahl, 139 Wash.2d at 688, 990 P.2d 396 (stating that, in revocation cases, "the harm in erroneously admitting hearsay evidence... is the possibility that the trial court will rely on unverified evidence in revoking a suspended sentence.")
*194 ¶ 24 The record clearly indicates that the DOC provided Price with written notice of the claimed parole violations, a list of the evidence against him, an opportunity to be heard in person and to present witnesses and documentary evidence, a neutral and detached hearing officer,[8] and a written statement by the hearing officer referring to the evidence that she relied on to justify her decision to revoke Price's DOSA sentences. Price's due process argument, therefore, turns on Morrissey's fourth component Price's right to confront and cross-examine adverse witnessesand his additional claim that the State should have appointed counsel to represent him at the violation hearing.

A. Right to Cross-Examine Adverse Witnesses
¶ 25 Price argues that the DOC denied him the right to confront adverse witnesses at his violation hearing. Price contends that the "hearing examiner ... resolved numerous factual issues based upon police reports containing hearsay information, without finding good cause for not allowing Mr. Price to confront and cross-examine these witnesses." Petitioner's Supp. Br. at 14-15.
¶ 26 The DOC responds that relevant hearsay is admissible at violation hearings because "many witnesses are unable or unwilling to attend the hearings, the DOC has neither subpoena power nor funding to support subpoenas, and police officers are generally unwilling to attend DOC hearings without a subpoena."[9] Resp't's Supp. Br. at 15. The DOC asserts that Campeau's testimony at the violation hearing corroborated important aspects of the officers' out-of-court statements. Finally, the DOC argues that its revocation hearing policies always guarantee greater due process protections than those required by Morrissey because, the DOC claims, under RCW 9.94A.737(3),[10] a DOC hearing officer may not make a finding of guilt based solely on hearsay evidence.
¶ 27 We reject the DOC's argument that its revocation hearing policies always guarantee greater due process protections of an offender's confrontation rights than Morrissey requires.[11] We hold, however, that Price was not denied the right to confront witnesses such that the DOC violated his due process rights. The hearing officer primarily relied on Campeau's hearing testimonynot hearsayto determine that Price committed the two violations. Campeau's testimony that Price grabbed her shirt as she tried to walk away from him was sufficient for the hearing officer to determine, by a preponderance *195 of the evidence, that Price assaulted[12] Campeau, even in the absence of the police officers' corroborating hearsay about Campeau's hand injuries, or the casino officer's hearsay that Price slammed Campeau into a wall. Price called Campeau as a witness and therefore clearly had an opportunity to confront Campeau about her version of events.
¶ 28 Although Campeau's testimony is arguably less conclusive with regard to the allegation of harassment,[13] she testified that she called the police after spending the night locked in a bedroom with her family in order to keep away from Price. She testified that she saw a knife, although she did not say that Price waved it around or threatened to slash her tires, as she wrote in her victim's statement after the incident.
¶ 29 The hearing officer explicitly stated in her report that she found Price guilty of harassment based on Campeau's hearing testimony. Price had an opportunity to examine and confront Campeau at the violation hearing. Moreover, to the extent that the hearing officer considered the officers' unconfronted hearsay statements in arriving at her decision, there was little danger that these hearsay statements were unreliable because they corroborated Campeau's hearing testimony. Significantly, the Morrissey court acknowledged that reliable hearsay could play a role in parole revocation hearings: "[T]he process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." 408 U.S. at 489, 92 S.Ct. 2593. In light of all these factors, we conclude that the DOC provided Price with due process and a fundamentally fair proceeding.
¶ 30 Finally, we hold that, under these circumstances, the DOC hearing officer's failure to make a good cause finding was harmless error. See Dahl, 139 Wash.2d at 688, 990 P.2d 396. As we have explained, the hearing officer relied primarily on Campeau's hearing testimonyrather than on hearsayto revoke Price's DOSA sentences.

B. Right to Counsel
¶ 31 Price argues that the State should have appointed counsel to represent him at the violation hearing. Price acknowledges Division One's holding in McNeal that "the State is not required to provide counsel to participate in community custody revocation hearings beyond the level authorized by current statutes and regulations." 99 Wash. App. at 635, 994 P.2d 890. Price asserts, however, that the number and nature of the alleged violations, the severity of DOSA revocation as a sanction, his denial of the charges, and his "competency history" warranted the assignment of counsel. Petitioner's Supp. Br. at 18. We disagree.
¶ 32 In Gagnon v. Scarpelli, the United States Supreme Court held that an indigent probationer's due process right to appointed counsel at a probation revocation hearing should be determined on "a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole *196 system." 411 U.S. 778, 790, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). The Scarpelli Court explained that Morrissey's minimum due process requirements "serve as substantial protection against ill-considered revocation," but it suggested that counsel should be provided "[p]resumptively" in cases where:
the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present.
Scarpelli, 411 U.S. at 786, 790.
¶ 33 In McNeal, Division One of this court squarely addressed Scarpelli's applicability to community custody revocation hearings. The McNeal court held that due process does not require appointed counsel at community custody revocation hearings because community custody, unlike probation and parole, is primarily punitive in nature:
The focus of the Scarpelli opinion is on the rehabilitative goal of probation and parole. Parole officers, who are normally concerned with successfully rehabilitating the parolee within the community, sometimes nevertheless recommend that parole be revoked. When this happens, the parole officer is no longer the parolee's advocate and advisor. He or she becomes an adversary during the revocation process, and counsel is needed to insure that the rehabilitation effort is not interrupted unnecessarily. Because the focus of the hearing is often on the extent of and future potential for rehabilitation, counsel may be necessary to advocate for the parolee. But ... our Supreme Court[, in State v. Ross, 129 Wash.2d 279, 286, 916 P.2d 405 (1996),] held that community custody, despite some rehabilitative adjuncts, is primarily punitive in nature. Absent the rehabilitative goal of probation and parole, the rationale of Scarpelli does not apply. And the burden on the State of providing counsel, including delay in and formalization of the hearings, the added expense and the administrative burden, override the marginal value counsel would provide at these in-custody hearings. The decision to revoke community custody is based primarily on factual determinations about whether the individual violated the conditions of community custody. The success or failure of the rehabilitative process is not even a factor. Thus, we conclude that the Morrissey requirements are sufficient to protect against a wrongful revocation of community custody.
99 Wash.App. at 634-35, 994 P.2d 890 (footnotes omitted).
¶ 34 We note that the McNeal court's holding that an offender is not entitled to appointed counsel at community custody violation hearings unless a statute or regulation dictates otherwise appears to conflict with the observation in State v. Ziegenfuss, 118 Wash.App. 110, 116, 74 P.3d 1205 (2003), that the right to counsel at such hearings should be determined on a case-by-case basis, as Scarpelli counsels. We need not resolve this apparent conflict at the present time because we hold that Price was not entitled to appointed counsel under these facts. This was not a complex case that involved evidentiary or legal subtleties. Rather, the case turned on straightforward factual determinations about the alleged violations and the credibility of various witnesses. Price informed the hearing officer that he had reviewed the evidence against him, and he successfully called Campeau to provide favorable testimony for him. The DOC gave Price notice of the violations and allowed him to present his version of events before a neutral hearing officer.
¶ 35 We also reject Price's passing argument in his brief concerning his "competency history."[14] Petitioner's Supp. Br. at 18. The hearing transcript reveals that Price *197 asked pertinent questions, objected to the timeliness of the hearing, and called a witness to support his defense. Under these facts, the DOC's compliance with Morrissey's minimum due process requirements served as adequate protection against an ill-considered revocation of Price's DOSA sentences.

II. Sufficiency
¶ 36 Price appears to argue that the evidence presented at his violation hearing was insufficient to support the hearing officer's guilty findings. We disagree.
¶ 37 As we noted above in our discussion of Price's confrontation rights, Campeau's testimony was sufficient to support the hearing officer's guilty findings. Although Price presented conflicting evidence, the hearing officer found the DOC's evidence more credible and persuasive. Credibility determinations are for the trier of fact and are not subject to review on appeal. State v. Mines, 163 Wash.2d 387, 391, 179 P.3d 835 (2008).

III. The DOC's Authority to Revoke Price's DOSA Sentences
¶ 38 Price contends that only a sentencing court "[has] the authority to revoke a DOSA and remand a defendant to custody for the remaining balance of his original sentence." Attach. to Petition at 9. Accordingly, he asserts that the DOC lacked authority to revoke his DOSA sentences. Alternatively, he argues that the hearing's officer justification for Price's DOSA revocationthe potential threat of harm to Campeau and Price's lack of responsibility and remorseare inappropriate bases for revocation under the DOC's own guidelines. Again, Price is incorrect.

A. The DOC's Statutory Authority
¶ 39 Price's arguments turn on the meaning of various statutes. Statutory interpretation is a question of law that we review de novo. In re Pers. Restraint of Cruz, 157 Wash.2d 83, 87, 134 P.3d 1166 (2006). The primary goal of statutory interpretation is to ascertain and give effect to the legislature's intent and purpose. Cruz, 157 Wash.2d at 87, 134 P.3d 1166. In order to give effect to the legislature's intent, we consider the statute as a whole and examine related statutes to help identify the legislative intent embodied in the statutory provision in question. Cruz, 157 Wash.2d at 88, 134 P.3d 1166.
¶ 40 The DOSA and community custody statutes in effect at the time of Price's crimes[15] gave the DOC authority to revoke an offender's DOSA sentence. The applicable DOSA statute states in relevant part:
(3) If the offender violates any of the sentence conditions in subsection (2)[[16]] of this section ... a violation hearing shall be held by the department unless waived by the offender.

*198 (a) If the department finds that conditions have been willfully violated, the offender may be reclassified to serve the remaining balance of the original sentence.

Former RCW 9.94A.660(3)(a) (Laws of 2002, ch. 175, § 10) (emphasis added). The community custody sanctions provisions in effect at the time of Price's crimes further clarifies that "[i]f an offender violates any condition or requirement of community custody, the department may transfer the offender to a more restrictive confinement status to serve up to the remaining portion of the sentence." Former RCW 9.94A.737(1) (Laws of 2002, ch. 175, § 15) (emphasis added). Thus, under the plain language of the DOSA and community custody statutes, the DOC had authority to hold a violation hearing and revoke the community custody portion of Price's DOSA sentences. See State v. Roy, 126 Wash.App. 124, 128, 107 P.3d 750 (2005) ("granted DOC the power to revoke a DOSA sentence and determine penalties for noncompliance").
¶ 41 The plain language of former RCW 9.94A.660(3)(a) and former RCW 9.94A.737(1) also defeats Price's argument, based on former RCW 9.94A.737(3),[17] that the DOC could impose sanctions only under a specified graduated sanction system. We conclude that the legislature's command in former RCW 9.94A.737(3) that the DOC "develop hearing procedures and a structure of graduated sanctions" did not impede the DOC's power to revoke Price's DOSA sentences under former RCW 9.94A.660(3)(a) and former RCW 9.94A.737(1).
¶ 42 Price suggests that because a 2005 amendment to the DOSA statute allows a trial court, on its own initiative, to determine whether an offender has violated the terms of the DOSA sentence and to impose sanctions, the DOC hearing officer lacked authority to revoke his DOSA sentences. See Laws of 2005, ch. 460, § 1. Even assuming that the amendment applies to Price's crimes, the amendment does not expressly preclude the DOC from acting under former RCW 9.94A.660(3)(a).
¶ 43 Price also argues that, under WAC 137-24-010, the DOC can reclassify him only if it finds that he failed to participate in or complete his drug treatment program. WAC 137-24-010 simply establishes that when the offender fails to complete or is administratively terminated from a treatment program, the offender is "subject to reclassification and service of the unexpired term of his/her sentence." Contrary to Price's assertion, the regulation does not address when or if the DOC can reclassify an offender for violating a community custody provision.

B. The DOC's Guidelines
¶ 44 Price argues that the hearing officer's justification for revoking Price's DOSA sentences violated the DOC's sanction guidelines. The DOC acknowledges the existence of a rebuttable presumption at the time of Price's violation hearing that "unless the offender ... failed to complete chemical dependency treatment or was convicted of a felony, a DOSA sentence would not be revoked until the third hearing."[18] Resp't's Supp. Br. at 21. The DOC asserts, however, that the presumption has been rebutted by the severity of Price's violations and the risk he poses to the community. We agree with the DOC.
¶ 45 Price bases his argument on a list of factors that appear in a section entitled "Determining the Sanction" in the DOC's community custody hearing guidelines.[19] Price asserts that the factors do not include the offender's risk of harm to a former victim or the offender's lack of accepting responsibility and showing remorse.
¶ 46 Price reads the DOC factors too narrowly. As the DOC notes, its sanction factors *199 include the risk that the offender poses to the community, the severity of the offender's violation, and the offender's assessed community risk level. Here, the hearing officer found that Price committed a violent offense against Campeau and also threatened her with harm. The presenting CCO noted four previous domestic violence incidents with Campeau in addition to Price's unwillingness to accept responsibility for the violations. With this evidence, the hearing officer acted well within the DOC guidelines by revoking Price's DOSA sentences as a sanction for his violations.

IV. Additional Issues
¶ 47 Price raises several additional arguments in his personal restraint petition and in his reply brief. We decline to consider the arguments that Price raises for the first time in his reply brief. See State v. White, 123 Wash.App. 106, 115 n. 1, 97 P.3d 34 (2004). Price's remaining arguments have no merit.
¶ 48 First, Price argues that the DOC cannot sanction him for failing to "obey all laws" because he was never charged with or convicted of a crime. Resp't's Ex. 1, Attach. D at 1. Price's community custody condition, however, did not require that Price refrain from being charged with or convicted of breaking the law. Rather, the conditions required him to obey all laws, which the hearing officer had authority to determine by a preponderance of the evidence. Accordingly, this argument fails.
¶ 49 Second, Price appears to argue that the hearing officer abused her discretion by revoking the DOSA sentences without first considering other, less drastic sanctions. Nothing in the record, however, demonstrates that the hearing officer failed to consider other alternatives before revoking Price's DOSA sentences.
¶ 50 Third, Price argues that cumulative error deprived him of his right to a fair hearing. Because Price has demonstrated only a single harmless error, this argument also fails.
¶ 51 We deny Price's petition.
We concur: HUNT and VAN DEREN, JJ.
NOTES
[1] RCW 9.94A.660.
[2] Price committed the crimes of unlawful possession with intent to deliver and attempting to elude on March 29, 2004. Price committed the crimes of escape and resisting arrest on December 8, 2004, when he fled the courtroom during a bail hearing.
[3] The trial court's DOSA sentences consisted of concurrent confinement periods of 45 months (possession with intent to deliver), 27.75 months (escape), and 12.75 months (attempting to elude), followed by the same periods for each conviction in community custody.
[4] Because the hearing officer used the terms "guilty" and "not guilty" to describe whether Price violated the "obey all laws" condition, we also employ these terms throughout this opinion. We note, however, thatunlike a criminal proceeding where the State must prove a defendant's guilt beyond a reasonable doubtthe State must prove that an offender failed to comply with a community custody condition only by a preponderance of the evidence. See RCW 9.94B.040(3)(c); WAC 137-24-030(10); WAC 137-104-050(14).
[5] Due to a typographical error, the five-page hearing officer's report contains two pages that are labeled as page two. Therefore, we impose page numbers from one to five on the report.
[6] Price's supervising CCO, who testified by telephone, was not present at the hearing. The DOC relies on presenting CCOs to represent supervising CCOs at the DOC's hearings.
[7] The DOC Regional Appeals Panel reviewed only the sanction's appropriateness and stated that Price should file a personal restraint petition in order to address other issues.
[8] Price challenged the hearing officer's neutrality for the first time in his original reply brief. We address this challenge although it is untimely because it implicates a core due process right under Morrissey. See Morrissey, 408 U.S. at 489, 92 S.Ct. 2593; see also State v. White, 123 Wash. App. 106, 115 n. 1, 97 P.3d 34 (2004) (stating that we will not consider an issue raised for the first time in a reply brief). Price's challenge relies entirely on documents suggesting that the hearing officer who revoked Price's DOSA sentences also sat on an appeals panel that previously considered a separate matter involving Price. This fact is unremarkable. Hearing officers, like judges, frequently must adjudicate different matters involving the same individual. Price has presented no other evidence of bias, and the record reveals none.
[9] DOC regulations permit offenders at DOSA revocation hearings and community custody violation hearings to "cross-examine witnesses appearing and testifying." WAC 137-24-040(8); WAC 137-104-060(8). DOC regulations also permit hearing officers to "receive relevant evidence including hearsay evidence." WAC 137-24-030(11)(d); WAC 137-104-050(15)(e).
[10] We cite to the present version of this statute, but note that it was codified at RCW 9.94A.737(8) at the time of Price's hearing. See former RCW 9.94A.737(8) (Laws of 2007, ch. 483, § 305).
[11] The DOC cites no statute, regulation, or DOC policy explicitly prohibits a DOC hearing officer from finding, based on hearsay alone, that an offender violated a sentencing condition. RCW 9.94A.737(3), which establishes procedures for community custody violation hearings, states, "[f]or purposes of this section, no finding of a violation of conditions may be based on unconfirmed or unconfirmable allegations." The prohibition against finding a violation based on "unconfirmed or unconfirmable allegations," however, is not equivalent to a prohibition against finding a violation based solely on hearsay evidence. Although the DOC asserts that it has interpreted RCW 9.94A.737(3) "to mean [that] no determination of guilt may be based on hearsay alone," the DOC cites no regulations or DOC policies that explicitly codify its interpretation. Resp't's Second Supp. Br. at 3.
[12] Price's actions meet at least one of the three recognized definitions of common law assault in Washington: (1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury on another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm. See State v. Elmi, 166 Wash.2d 209, 215, 207 P.3d 439 (2009).
[13] (1) A person is guilty of harassment if:

(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; or
(ii) To cause physical damage to the property of a person other than the actor; or
(iii) To subject the person threatened or any other person to physical confinement or restraint; or
(iv) Maliciously to do any other act which is intended to substantially harm the person threatened or another with respect to his or her physical or mental health or safety; and
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. "Words or conduct" includes, in addition to any other form of communication or conduct, the sending of an electronic communication.
RCW 9A.46.020(1). The term "mental health" in RCW 9A.46.020(1)(a)(iv) renders that subsection unconstitutionally vague and overbroad. State v. Williams, 144 Wash.2d 197, 212, 26 P.3d 890 (2001).
[14] To support his competency argument, Price cites an Order of Commitment for Ninety Days, dated March 16, 2005, that the trial court entered after Price fled the courtroom at a bail hearing. A few months later, Price stipulated to a subsequent report by Western State Hospital that he had no competency problems.
[15] The versions of the DOSA and community custody violation statutes that the legislature amended in 2002 apply to Price's 2004 crimes. Former RCW 9.94A.660 (Laws of 2002, ch. 175, §§ 10, 15); see also State v. Hodgson, 108 Wash.2d 662, 669-70, 740 P.2d 848 (1987) (noting that RCW 10.01.040 "saves only substantive rights and liabilities of a repealed statute"); State v. Toney, 103 Wash.App. 862, 864-65, 14 P.3d 826 (2000) (relying on RCW 10.01.040 to determine that, because DOSA is a "criminal and penal" statute, DOSA amendments "[do] not apply to crimes committed before [the amendments'] effective date" where the amendments "do not contain an express declaration on retroactivity"). Therefore, we do not address Price's arguments that are based on versions of the DOSA and community custody statutes not in effect at the time of his crimes.

We further note that the legislature twice amended the DOSA statute during the 2002 legislative session. Laws of 2002, ch. 290, § 20; Laws of 2002, ch. 175, § 10. Neither amendment altered any of the language of former RCW 9.94A.660 that we quote or discuss in this opinion. In order to avoid confusion, however, we note that our citation to "former RCW 9.94A.660" throughout this opinion refers to the statutory language that appears in chapter 175, section 10 of the 2002 session laws. Chapter 290, section 20 of the session laws did not take effect until July 1, 2004, which is after Price committed unlawful possession with intent to deliver and attempting to elude, but before he committed escape and resisting arrest. See Laws of 2002, ch. 290, § 31.
[16] Subsection (2) of former RCW 9.94A.660 includes a number of conditions that the court may impose on an offender, including "[s]uch other conditions as the court may require such as affirmative conditions." Former RCW 9.94A.660(2)(d)(vii). This broad provision supports the "obey all laws" provision that the trial court imposed here.
[17] Laws of 2002, ch. 175, § 15.
[18] The DOC does not cite the legal basis for this rebuttable presumption.
[19] The factors are: (1) the risk that the offender poses to the community, (2) the severity of the offender's violation, (3) the offender's assessed community risk level, (4) the offender's programming/treatment needs, (5) the offender's performance while on supervision, (6) previous violations by the offender while under supervision, (7) the offender's receptiveness to supervision, (8) the relationship of the violation to the offender's crime of conviction, and (9) the availability of other intervention means and the anticipated effect on the offender.