# YOUNG ET AL. *v.* HARPER

No. 95–1598.  Argued December 9, 1996—Decided March 18, 1997

*Sandra D. Howard*, Assistant Attorney General of Oklahoma, argued the cause for petitioners. With her on the briefs were *W. A. Drew Edmondson*, Attorney General, and *Jennifer B. Miller*, Assistant Attorney General.

*Margaret Winter*, by appointment of the Court, 518 U. S. 1015, argued the cause for respondent. With her on the brief were *Marjorie Rifkin, Elizabeth Alexander, Micheal Salem*, and *Steven R. Shapiro.**

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the narrow question whether a program employed by the State of Oklahoma to reduce the overcrowd-

---

*A brief of *amici curiae* urging reversal was filed for the State of Nevada et al. by *Frankie Sue Del Papa*, Attorney General of Nevada, and *Anne Cathcart*, Senior Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Joseph P. Mazurek* of Montana, and *Dennis C. Vacco* of New York.

ing of its prisons was sufficiently like parole that a person in the program was entitled to the procedural protections set forth in *Morrissey* v. *Brewer*, 408 U. S. 471 (1972), before he could be removed from it. We hold that the program, as it appears to have been structured at the time respondent was placed on it, differed from parole in name alone, and affirm the decision of the Court of Appeals for the Tenth Circuit.

I

As pertinent to this case, Oklahoma operated two programs under which inmates were conditionally released from prison before the expiration of their sentences. One was parole, the other was the Preparole Conditional Supervision Program (preparole or Program). The Program was in effect whenever the population of the prison system exceeded 95% of its capacity. Okla. Stat., Tit. 57, §365(A) (Supp. 1990). An inmate could be placed on preparole after serving 15% of his sentence, §365(A)(2), and he was eligible for parole when one-third of his sentence had elapsed, §332.7(A). The Pardon and Parole Board (Board) had a role in the placement of both parolees and preparolees. The Board itself determined who could participate in the Program, while the Governor, based on the Board's recommendation, decided whether a prisoner would be paroled. As we describe further in Part II, *infra*, participants in the Program were released subject to constraints similar to those imposed on parolees.

In October 1990, after reviewing respondent Ernest Eugene Harper's criminal record and conduct while incarcerated, the Pardon and Parole Board simultaneously recommended him for parole and released him under the Program. At that time, respondent had served 15 years of a life sentence for two murders. Before his release, respondent underwent orientation, during which he reviewed the "Rules and Conditions of Pre-Parole Conditional Supervision," see App. 7, and after which he executed a document

indicating that he "underst[ood] that being classified to community level depend[ed] upon [his] compliance with each of these expectations," *id.*, at 6. He spent five apparently uneventful months outside the penitentiary. Nonetheless, the Governor of Oklahoma denied respondent parole. On March 14, 1991, respondent was telephoned by his parole officer, informed of the Governor's decision, and told to report back to prison, which he did later that day.

Respondent filed a petition for a writ of habeas corpus in state court complaining that his summary return to prison had deprived him of liberty without due process. The state trial court denied relief and the Oklahoma Court of Criminal Appeals affirmed. 852 P. 2d 164 (1993). The Court of Criminal Appeals concluded that respondent's removal from the Program impinged only upon an interest in his "degree of confinement," an interest to which the procedural protections set out in *Morrissey* did not attach. 852 P. 2d, at 165. The court found "[d]ispositive of the issue" the fact that respondent "was not granted parole by the Governor of Oklahoma." *Ibid.* The court noted that the Board had adopted a procedure under which preparolees subsequently denied parole remained on the Program, and had their cases reviewed within 90 days of the denial for a determination whether they should continue on preparole. According to the court, "such a procedure gives an inmate sufficient notice when he is placed in the program that he may be removed from it when the governor exercises his discretion and declines to grant parole." *Ibid.*

Respondent fared no better in District Court on his petition for relief under 28 U. S. C. § 2254. But the Tenth Circuit reversed. 64 F. 3d 563 (1995). It determined that preparole "more closely resembles parole or probation than even the more permissive forms of institutional confinement" and that "[d]ue process therefore mandates that program participants receive at least the procedural protections described in *Morrissey*." *Id.*, at 566–567. Petitioners sought certio-

rari on the limited question whether preparole "is more simi-
lar to parole or minimum security imprisonment; and, thus,
whether continued participation in such program is protected
by the Due Process Clause of the Fourteenth Amendment."
Pet. for Cert. i.  We granted certiorari, 517 U. S. 1219 (1996),
and, because we find that preparole as it existed at the time
of respondent's release was equivalent to parole as under-
stood in *Morrissey,* we affirm.[1]

## II

"The essence of parole is release from prison, before the
completion of sentence, on the condition that the prisoner
abide by certain rules during the balance of the sentence."
*Morrissey,* 408 U. S., at 477.  In *Morrissey,* we described
the "nature of the interest of the parolee in his continued
liberty":

> "[H]e can be gainfully employed and is free to be with
> family and friends and to form the other enduring at-
> tachments of normal life.  Though the State properly
> subjects him to many restrictions not applicable to other
> citizens, his condition is very different from that of con-
> finement in a prison. . . . The parolee has relied on at

---

[1] Respondent contends that the petition for certiorari was filed out of
time, and that we are thus without jurisdiction.  We disagree.  A timely
filed petition for rehearing will toll the running of the 90-day period for
filing a petition for certiorari until disposition of the rehearing petition.
*Missouri* v. *Jenkins,* 495 U. S. 33, 46 (1990).  The petition for certiorari
was filed within 90 days of the denial of rehearing.  Although the petition
for rehearing was filed two days late, the Tenth Circuit granted petitioners
"leave to file a late petition for rehearing and suggestion for rehearing en
banc," as it had authority to do.  See Fed. Rule App. Proc. 40(a).  More-
over, after granting petitioners leave to file the petition for rehearing, the
Tenth Circuit treated it as timely and no mandate issued until after the
petition was denied.  See Fed. Rule App. Proc. 41(a).  In these circum-
stances, we are satisfied that both the petition for rehearing and the subse-
quent petition for certiorari were timely filed.

least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.*, at 482.

This passage could just as easily have applied to respondent while he was on preparole. In compliance with state procedures, he was released from prison before the expiration of his sentence. He kept his own residence; he sought, obtained, and maintained a job; and he lived a life generally free of the incidents of imprisonment. To be sure, respondent's liberty was not unlimited. He was not permitted to use alcohol, to incur other than educational debt, or to travel outside the county without permission. App. 7–8. And he was required to report regularly to a parole officer. *Id.*, at 7. The liberty of a parolee is similarly limited, but that did not in *Morrissey*, 408 U. S., at 478, render such liberty beyond procedural protection.

Petitioners do not ask us to revisit *Morrissey;* they merely dispute that preparole falls within its compass. Our inquiry, they argue, should be controlled instead by *Meachum* v. *Fano*, 427 U. S. 215 (1976). There, we determined that the interest of a prisoner in avoiding an intrastate prison transfer was "too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Id.*, at 228; see also *Sandin* v. *Conner*, 515 U. S. 472, 487 (1995). Petitioners contend that reincarceration of a preparolee was nothing more than a "transfe[r] to a higher degree of confinement" or a "classification to a more supervised prison environment," Brief for Petitioners 18, which, like transfers within the prison setting, involved no liberty interest.

In support of their argument that preparole was merely a lower security classification and not parole, petitioners identify several aspects of the Program said to render it different from parole. Some of these do not, in fact, appear to distinguish the two programs. Others serve only to set preparole

apart from the specific terms of parole as it existed in Oklahoma, but not from the more general class of parole identified in *Morrissey*. None of the differences—real or imagined—supports a view of the Program as having been anything other than parole as described in *Morrissey*.

We first take up the phantom differences. We are told at the outset that the purposes of preparole and parole were different. Preparole was intended "to reduce prison overcrowding," while parole was designed "to help reintegrate the inmate into society." Reply Brief for Petitioners 10. This alleged difference is less than it seems. Parole could also be employed to reduce prison overcrowding, see Okla. Stat., Tit. 57, § 332.7(B) (Supp. 1990). And the Program's requirement that its participants work or attend school belies the notion that preparole was concerned only with moving bodies outside of teeming prison yards. In fact, in their brief below, petitioners described the Program as one in which the Department of Corrections "places eligible inmates into a community for the purpose of reintegration into society." Brief for Appellees in No. 95–5026 (CA10), p. 7, n. 2.

We are also told that "an inmate on the Program continues to serve his sentence and receives earned credits . . . , whereas a parolee is not serving his sentence and, if parole is revoked, the parolee is not entitled to deduct from his sentence time spent on parole." Reply Brief for Petitioners 11. Our review of the statute in effect when respondent was released, however, reveals that a parolee was "entitled to a deduction from his sentence for all time during which he has been or may be on parole" and that, even when parole was revoked, the Board had the discretion to credit time spent on parole against the sentence. Okla. Stat., Tit. 57, § 350 (Supp. 1990).

Petitioners next argue that preparolees, unlike parolees, remained within the custody of the Department of Corrections. This is said to be evidenced by respondent's having

had to report to his parole officer weekly and to provide the officer with a weekly itinerary. Reply Brief for Petitioners 13. We are at a loss to explain why respondent's regular visits to his parole officer rendered him more "in custody" than a parolee, who was required to make similar visits. See App. to Brief for Respondent 28a. Likewise, the provision that preparolees "be subject to disciplinary proceedings as established by the Department of Corrections" in the event that they "violate any rule or condition during the period of community supervision," Okla. Stat., Tit. 57, § 365(E) (Supp. 1990), did not distinguish their "custodial" status from that of parolees, who were also subject to the department's custody in the event of a parole violation. See Reply Brief for Petitioners 13.

Petitioners, for their final nonexistent distinction, argue that, because a preparolee "is aware that he may be transferred to a higher security level if the Governor, through his discretionary power, denies parole," he does not enjoy the same liberty interest as a parolee. Brief for Petitioners 20. Preparole, contend petitioners, was thus akin to a furlough program, in which liberty was not conditioned on the participant's behavior but on extrinsic events. By this reasoning, respondent would have lacked the "implicit promise" that his liberty would continue so long as he complied with the conditions of his release, *Morrissey*, 408 U. S., at 482. Respondent concedes the reasoning of petitioners' argument as it relates to furloughs, but challenges the premise that his participation in the Program was conditioned on the Governor's decision regarding parole.

In support of their assertion that a preparolee knew that a denial of parole could result in reincarceration, petitioners rely—as they have throughout this litigation—on a procedure promulgated in August 1991, nearly five months *after* respondent was returned to prison. See Pardon and Parole Board Procedure No. 004–011 (1991), App. to Pet. for Cert.

56a.[2]   The Court of Criminal Appeals also relied on this provision, but because it was not in effect when respondent was released, it has little relevance to this case.

Nor have we been presented with any other evidence to substantiate this asserted limitation on respondent's release. The closest petitioners come is to direct us to the orientation form reviewed with respondent upon his release.   Item 9 of that orientation form says: "Reviewed options available in the event of parole denial."   App. 5.   Mindful of Procedure No. 004–011, as amended after respondent was reincarcerated, it is *possible* to read this item as indicating that respondent was told his participation in the Program could be terminated if parole were denied.   But the mere possibility of respondent's having been so informed is insufficient to overcome his showing of the facially complete, written "Rules and Conditions of Pre-Parole Conditional Supervision," App. 7–9, which said nothing about the effect of a parole denial.

Counsel for the State also claims that at the time respondent was participating in the Program, preparolees were always reincarcerated if the Governor denied them parole. Tr. of Oral Arg. 8.   In the absence of evidence to this effect—and the State points to none—this assertion is insufficient to rebut the seemingly complete rules and conditions of respondent's release.   On the record before us, therefore, the premise of petitioners' argument—that respondent's continued participation was conditioned on extrinsic events—is illusory, and the analogy to furlough inapposite.[3]

---

[2] The version of Procedure No. 004–011 in effect when respondent was placed on the Program was silent as to a parole denial's effect.   See App. to Pet. for Cert. 43a–52a.   The procedure was amended again in 1994, and now provides that "[i]nmates denied parole by the Governor while on [preparole] will remain on the program, unless returned to higher security by due process."   App. to Brief for Respondent 38a.

[3] Equally illusory is the argument, which petitioners made for the first time in this Court, that the Board had authority to reimprison a preparolee for any reason or for no reason.   The written rules and conditions

Petitioners do identify some actual differences between preparole and Oklahoma's version of parole, but these do no better at convincing us that preparole was different from parole as we understood it in *Morrissey*. As petitioners point out, participation in the Program was ordered by the Board, while the Governor conferred parole. In this regard, preparole was different from parole in Oklahoma; but it was no different from parole as we described it in *Morrissey*. See 408 U. S., at 477–478. In addition, preparolees who "escape[d]" from the Program could be prosecuted as though they had escaped from prison, see Okla. Stat., Tit. 57, § 365(F) (Supp. 1990), while it appears that parolees who "escaped" from parole were subject not to further prosecution, but to revocation of parole, see Reply Brief for Petitioners 11. That the punishment for failure to abide by one of the conditions of his liberty was potentially greater for a preparolee than for a parolee did not itself diminish that liberty. Petitioners also note that a preparolee could not leave Oklahoma under any circumstances, App. 7, while a parolee could leave Oklahoma with his parole officer's permission, App. to Brief for Respondent 27a. This minor difference in a released prisoner's ability to travel did not, we think, alter the fundamentally parole-like nature of the Program.[4]

## III

We conclude that the Program, as it existed when respondent was released, was a kind of parole as we understood pa-

---

of respondent's release identify no such absolute discretion, and petitioners point to nothing to support their contention.

[4] A comparison of the conditions of preparole of which respondent was informed, App. 7–9, and those of which a roughly contemporary parolee would have been informed, App. to Brief for Respondent 27a–30a, reveals that—except for the travel and "escape" provisions—the two sets of conditions were essentially identical.

role in *Morrissey.*[5]   The judgment of the Tenth Circuit is therefore affirmed.

*It is so ordered.*

---

[5] The Program appears to be different now.   We have no occasion to pass on whether the State's amendments to the Program, adopted since respondent was reincarcerated, render the liberty interest of a present-day preparolee different in kind from that of a parolee.