NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2806
_____

CLARENCE HALEY,
                                        Appellant

v.

THE KINTOCK GROUP; ROBERT T. LATIMER, MD; DOMINIC FORTE;
SADIQI MUHAMMAD; JOSEPH, first name unknown;
BROWN, first name unknown; IZAGUIRRE, first name unknown;
CLARK, first name unknown
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-11-cv-05606)
District Judge:  Honorable William J. Martini
_____

Submitted Under Third Circuit LAR 34.1(a)
June 3, 2014

Before:  HARDIMAN, SCIRICA and ROTH, *Circuit Judges*.

(Filed: September 29, 2014)
_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

        Clarence Haley appeals an order of the District Court denying his claim that the

Kintock Group and several of its employees violated his constitutional rights when they discharged him from a halfway house for medical reasons. Because Haley lacks a protected liberty interest in remaining at the halfway house, we will affirm.

I

Haley was an inmate in the New Jersey state prison system and was paroled on June 4, 2010. As a condition of his parole, he was required to report to a halfway house run by the Kintock Group and to successfully complete Kintock's "Stages to Enhance Parolee Success" (STEPS) Program. The New Jersey State Parole Board contracts with Kintock, a private organization, to provide alternatives to incarceration and re-entry services to parolees. Participants in the STEPS program sign a contract with the Kintock Group before entering the program, subjecting them to a range of restrictions. D. Ct. Op. 2. Residents are required to "abide by a dress code, keep their rooms neat, follow a strict bedtime, request permission to leave and enter the facility, submit to random searches, and submit to random urine testing." *Id.* The Kintock Group reserved its right to reject any "applicant with mental illness who . . . [was] unable to successfully participate in the program, who . . . [was] not stabilized on [a] medication regime, or who . . . [posed] a danger to him/herself, other residents/offenders or the community." SA65-66. Haley had also signed an agreement indicating that he understood that his "failure to complete the program [could] result in a violation of parole and re-incarceration." D. Ct. Op. at 2.

While in the STEPS program, Haley filed two grievances about the staff. The first alleged that the kitchen staff served him chemically-laced food, and the second alleged

that the staff withheld or destroyed his medical records from the New Jersey Department of Corrections. *Id.* at 2. Haley was evaluated by a psychiatrist, Dr. Robert Latimer, who diagnosed him with paranoid schizophrenia and antisocial behavior, noting that Haley was "hostile and highly delusional," "uncooperative and irrational," and "argumentative, sullen, negativistic and angry." *Id.* Dr. Latimer concluded that Haley was a "danger to others" and recommended that he be transferred to a psychiatric facility where he could be supervised "24/7." *Id.* Soon thereafter, Haley was discharged from the STEPS program on medical grounds and sent back to state prison.

In September 2011, Haley filed a pro se complaint against the Kintock Group and several of its employees, alleging civil rights violations pursuant to 42 U.S.C. § 1983. He seeks $20 million in damages on the grounds that he was improperly discharged from the STEPS program and that Dr. Latimer "colluded" with the other defendants and submitted a "contrived and bogus psychological evaluation." *Id*. In May 2012, Haley amended his complaint to allege violations of his First, Fourth, Eighth, and Fourteenth Amendment rights.

When discovery ended in July 2012, Haley had not deposed any Kintock employees. Kintock moved for summary judgment in August 2012, which the District Court granted in May 2013. Haley filed a motion for reconsideration, which was denied. He filed this timely appeal soon thereafter.

II[1]

We review the District Court's order granting summary judgment de novo. *Azur v. Chase Bank, USA Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We "may affirm the District Court on any grounds supported by the record." *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (en banc) (quoting *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc)).

To obtain relief under section 1983, Haley must show that Kintock: (1) acted under color of state law, and (2) deprived Haley of his constitutional rights. 42 U.S.C. § 1983; *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). At issue is whether the Kintock Group's actions violated Haley's constitutional right to due process under the Fourteenth Amendment and whether they were driven by a retaliatory motive in violation of Haley's First Amendment rights.[2]

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

[2] Though the District Court correctly concluded that Haley's Fourth and Eighth Amendment claims "boil down" to a due process inquiry, D. Ct. Op. 3, his First Amendment claim cannot be as easily collapsed under the umbrella of due process. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) ("[T]he law of this circuit is clear that a

4

To establish a due process violation, Haley must show that: (1) he had a protected liberty interest in remaining in the halfway house, and (2) that the procedures that led to the deprivation of his liberty interest were constitutionally insufficient. *Sample v. Diecks*, 885 F.2d 1099, 1113 (3d Cir. 1989).

Our review of the record leads us to conclude that Haley has failed to show that he had a protected liberty interest in remaining at the Kintock facility. As the District Court aptly noted, the Due Process Clause does not protect an individual's interest in remaining at a particular form of institutional confinement, whether it be a prison or a halfway house. *Montanye v. Haymes*, 427 U.S. 236, 242 (1976) ("As long as the conditions or degree of confinement . . . is within the sentence imposed . . . and is not otherwise violative of the Constitution, the Due Process Clause does not itself subject an inmate's treatment by prison authorities to judicial oversight."). Moreover, in *Asquith v. Department of Corrections*, 186 F.3d 407 (3d Cir. 1999), we held that placement in a halfway house amounts to "institutional confinement" when significant restrictions are placed on the freedom of its residents, and that removal from such a halfway house therefore does "not trigger the protections of the Due Process Clause." *Id.* at 411.

As the dissent notes, it is true that Haley was on parole, which was not the case with Asquith. That fact alone is insufficient to establish a liberty interest, however, for it is the conditions of parole that determine the liberty interest. In *Morrissey v. Brewer*, 408

prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied.").

5

U.S. 471 (1972), the Supreme Court held that "[w]hether any procedural protections are due depends on the extent to which an individual will be condemned to suffer grievous loss," which in turn requires an examination of the "particular situation" at hand. *Id.* at 481 (internal quotation marks and citation omitted); *see also Goldberg v. Kelly*, 397 U.S. 254, 263 (1970). The concept of liberty envisioned by the Fourteenth Amendment is "flexible," and reflects "recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey*, 408 U.S. at 481. In *Morrissey*, the Supreme Court described the "nature of the interest of the parolee in his continued liberty" as follows:

> Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. . . . The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions.
>
> We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others.

*Id.* at 482; *see also Young v. Harper*, 520 U.S. 143, 147-48 (1997) (holding a preparolee had a liberty interest in his continued participation in an early release program that allowed him to keep his own residence and live "a life generally free of the incidents of imprisonment"). Thus, the facts in *Morrissey* are easily distinguishable from Haley's situation. Whereas Morrissey could spend his day as he saw fit, maintain employment, live with family and commingle with friends—in other words, "liv[e] a relatively normal

6

life," *Morrissey*, 408 U.S. at 482—Haley was subject to strict rules governing his daily life. These restrictions were nearly identical to those in Asquith's "particular situation" we found to constitute "institutional confinement." *See Asquith*, 186 F.3d at 411..

As in *Asquith*, Haley's parole conditions amounted to institutional confinement: he was strictly monitored, had a curfew, had to "stand count" several times a day, was not free to leave the facility without permission and had to "check in" when he was away from the facility, was subject to random searches and urine tests without prior notice, and was not at liberty to visit with friends and family unless he was granted specific visitation privileges. SA45–49. Similarly, Asquith had "a curfew . . . had to 'stand count' several times a day[,] . . . was required . . . to submit to urine monitoring," and was subject to random searches." *Asquith*, 186 F.3d at 411. Because of these similarities, we hold that Haley—like Asquith—was in a form of institutional confinement and lacked a protected liberty interest under the Fourteenth Amendment. Accordingly, the District Court did not err in granting summary judgment to the Kintock Group.

III

Haley's First Amendment claim alleges that he was deprived of his liberty in retaliation for his complaints. To establish a First Amendment retaliation claim, Haley must prove that (1) he engaged in constitutionally protected conduct, (2) he suffered adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) the protected conduct caused the retaliatory action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). The dissent, borrowing a standard used in the

7

employment context, argues that the temporal proximity between Haley's protected conduct—his filing of two grievances—and the retaliatory action, his removal from the Kintock facility, establishes an inference of retaliatory motive. Dissent at 7 (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012)). However, given our conclusion that Haley was under conditions of institutional confinement, the standard for retaliation in the prisoner-inmate context provides a more apt framework for analyzing Haley's claim. In this context, even if the inmate "demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334; *see also George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013) (holding that even where a plaintiff makes a prima facie case of retaliation, that claim fails when there is an "obvious alternative explanation" for the officials' conduct). Thus, even if Haley made a prima facie case of retaliation, there is an "obvious alternative explanation" that is "reasonably related to a legitimate penological interest"—Dr. Latimer's diagnosis that Haley was schizophrenic, hostile, and posed a danger to others. Accordingly, we are satisfied that Haley would have been removed from the halfway house following Dr. Latimer's diagnosis—per the rules of the STEPS program—regardless of his two filed grievances. Therefore, his First Amendment claim fails.

\* \* \*

For the foregoing reasons, we will affirm the District Court's order granting summary judgment in favor of the Kintock Group.

ROTH, <u>Circuit Judge</u>, dissenting:

In 2010, the State of New Jersey Parole Board granted parole to Clarence Haley. Parole is a legal status created by state law that allows an inmate to leave prison and live in the community at large, subject to various conditions. N.J. Stat. Ann. § 30:4-123.51 (outlining conditions for attaining parole). In *Morrissey*, the Supreme Court held that prisoners released on parole had a liberty interest in that status. *Morrissey v. Brewer*, 408 U.S. 471 (1972). The Court does not define what different conditions of parole, imposed on parolees by different states, may create that liberty interest From my review of the *Morrissey* opinion, I conclude that it applies to all parolees, whatever may be the conditions of parole imposed by the State. Thus, "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.* at 482.

I believe that the majority errs in concluding that, if the conditions of parole imposed on one prisoner equate to the conditions of community release imposed on another prisoner, we are free to conclude that the paroled prisoner has no liberty interest in his release. I do not agree. *Morrissey* does not grant courts the freedom to review the conditions of parole to determine if a liberty interest has been created. Nor do I think that we want to avoid the bright line rule created by the Court in *Morrissey*. If we follow the majority, we are opening ourselves up to having to review the conditions of parole in every case in which a liberty interest is claimed. I do not favor such a situation.

For the reasons stated above, I respectfully dissent.

1