STATE OF VERMONT
CHITTENDEN COUNTY, SS.

CHITTENDEN COUNTY CLERK
FILED IN CLERKS OFFICE

JUN 1 9 2002

DIANE A LAVALLEE
CLERK

SCOTT MILLETTE,　　　　　　　　　)
　　　　　Petitioner,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　Chittenden Superior Court
　　　　　　　　　　　　　　　　　　　)　　　Docket No. S0436-02 CnC
JOHN GORCZYK,　　　　　　　　　　)
　　　　　Respondent.　　　　　　　　)

## MEMORANDUM OF DECISION AND ORDER

Petition for Writ of Habeas Corpus

This case is before the Court on Petitioner's Petition for Writ of Habeas Corpus filed April 9, 2002. A hearing on the matter commenced on April 26th and was completed on May 15th. Petitioner, an inmate, is represented by Mark E. Furlan, Esq. Respondent, the Commissioner of the Department of Corrections, is represented by Assistant Attorney General Nicole Andreson, Esq.

### Findings of Fact

In September of 2001, Scott Millette had been charged with domestic assault. As part of considering entering a plea agreement, he went through an assessment and interview process with the Department of Corrections to see if he was eligible for the rehabilitative IDAP program (intensive domestic abuse program). He was found to be eligible, and he agreed to participate in it and abide by its rules. He further qualified for Preapproved Furlough (PAF). This meant that it was predetermined, prior to entering a plea or sentencing, that he was eligible upon conviction to serve a sentence by living in the community under restrictions and limitations on daily life as long as he was participating successfully in the IDAP program and abiding by program and furlough rules and conditions. On September 10, 2001, he signed two agreements. In one, he agreed to all of the requirements and rules of participation of the IDAP program, and in the other, he agreed to abide by the rules and restrictions of furlough.

On September 28, 2001, having qualified and agreed to the terms of the IDAP and PAF programs, he entered pleas and was convicted of second degree domestic assault, for which he was sentenced to 18 months to 5 years, and reckless endangerment, for which he was sentenced concurrently to 0 to 12 months. The mittimus specified that both sentences were to be served on

-1-

Preapproved Furlough while participating in the IDAP program.

In September 2001, when Scott Millette was sentenced to preapproved furlough, the Department of Corrections had in place a policy and procedures for revocation of furlough under which, before furlough status was revoked, the Department conducted an administrative hearing, called a "601 hearing,"[1] within four days of furlough suspension to determine whether or not an offender had violated conditions of furlough and whether furlough status would be revoked by the Commissioner.[2] The procedures included a written notice of hearing and reasons for the proposed revocation, an opportunity to be present and heard, assistance of a hearing assistant, an opportunity to present documentary evidence and call reasonably available witnesses, an opportunity to review documentary evidence and question witnesses, recording of the hearing by tape, and a requirement that the hearing officer make findings of fact supporting any decision to revoke furlough. The procedure was the same for all proposed furlough revocations, regardless of whether the offender had been put out on furlough from a facility by the Department of Corrections acting in its discretion, or had been on PAF from the time of the original sentencing pursuant to a mittimus.

From September 2001 to March of 2002, Scott Millette served his sentence while living in the community on furlough status, and he participated in the IDAP program. One of the requirements of IDAP is that offenders bring up during IDAP group discussions any conduct or behavior in which they have engaged that is inconsistent with program requirements. Scott Millette did not describe any such conduct during his participation. At some point during the fall, he mentioned in group that he expected the charges against him would be dropped.

His furlough conditions were restrictive. He had to live at his parents' residence, which had been approved by the Department of Corrections, and he could not leave the residence at any

---

[1] The name derived from the policy name, "Furlough (601)," that had been in place since May 1, 1990, and implemented under Directive 372.03 dated October 1, 1996.

[2] By statute, the Commissioner is authorized to suspend furlough immediately and place an inmate in a correction facility:

> When any enforcement officer, as defined in section 4 of Title 28, employee of the department, or correctional officer responsible for supervising an offender believes the offender is in violation of any verbal or written condition of the furlough, the officer or employee may immediately lodge the offender at a correctional facility or orally or in writing deputize any law enforcement officer or agency to arrest and lodge the offender at such a facility. The officer or employee shall subsequently document the reason for taking such action.

28 V.S.A. § 808(d). A 601 hearing could take place after an immediate suspension or anytime.

time without DOC approval. He and his residence were subject to search at any time. He was subject to drug testing at any time. He could not drive or drink alcohol, and the only visitors he could receive were ones preapproved by DOC. He could only work at a preapproved job at preapproved times. He did not have the freedom to leave his residence on a discretionary basis; he could only do so when and if it was on his approved schedule to do so, and in that event he was required to be exactly where he was preapproved to go.

On the other hand, the nature and quality of daily life was much different than if he had been serving his sentence "on the inside." He could live in the comfort and surroundings of his partents' home, with his own possessions. He worked as an electrician from 7:00 to 3:30, and his work involved traveling to different job sites daily, which he was permitted to do without restriction as long as he called in to an answering machine daily to notify DOC of the location of his work site. His three-year-old daughter spent extended visitation time with him at his residence on weekends, and he could interact with her without restrictions, with ordinary parent-child playfulness and affection. He could take her to parks, movies, and restaurants as long as he specified in advance and received approval for exact locations and times. His brother visited him regularly. He could decide what food to cook himself for dinner, or eat out at preapproved places and times. He could sleep in his own bed, and use the telephone. He could engage in recreational exercise, and he regularly played basketball at the Milton gym. Although living a restricted life, he was not living in an institutional corrections facility.

He had a reasonable expectation that he could continue to live at home and work, albeit under the strict restrictions of furlough, including full participation in IDAP programming, as long as he did not violate any of the conditions and requirements of his PAF and IDAP agreements. Based on the policy and procedures in place at the time he entered his pleas, he could be removed from the community and placed in prison immediately by suspension pursuant to 28 V.S.A. § 808(d), but such a suspension could not last more than four days and his furlough status would not be revoked without a 601 hearing.

Prior to March 2, 2002, personnel in the Department of Corrections had been trying to figure out how to address some problems that had been developing in the corrections system over a period of months. On March 2, 2002, the Department filed an Emergency Rule packet with the Secretary of State, putting into effect (on an emergency basis under the Administrative Procedures Act), a new rule with respect to furlough revocation.[3] Pursuant to the terms of the APA, the Emergency Rule is in effect until June 29, 2002.

Under the Emergency Rule and proposed new rule, 601 hearings for furlough revocation are eliminated. Ray Flum, DOC Director of Classifications and author of the rule, testified at the hearing in this case, and the court finds, that the focus of the emergency and proposed process is

---

[3] A few days later, the same rule was submitted for nonemergency processing under the APA as a proposed new rule. The steps specified under the APA for consideration of the proposed rule on a long term basis are in process.

on how an offender will be treated under an offender classification system applicable to all offenders, and not on how the decision to revoke furlough will be made.[4] The Emergency Rule has no procedure for furlough revocation. There is an expectation that upon an allegation of violation of the conditions of furlough, an offender will have a dialogue with his or her supervision corrections officer about the allegation of violation. If the officer considers that graduated sanctions are a possible response, a face to face meeting will be held between the offender and the probation officer to discuss the possibility of a graduated sanction. If the corrections officer determines that graduated sanctions are not a possibility, then, in place of what was previously a 601 hearing, a case staffing meeting will be held to determine the offender's classification and treatment. The offender is not entitled to be present at the case staffing meeting. No specific findings are made that the offender violated furlough program requirements. The underlying premise of the new rule is that an offender has no liberty interest in furlough, and the Department has full discretion in determining how to manage an offender's case while the offender is under sentence, whether on preapproved furlough or not.

On March 11, 2002, the victim of Scott Millette's offense telephoned his corrections supervision officer, Heather Allin, to tell her that Mr. Millette had been in contact with her in November of 2001, that he had tried to get her to file papers to get his case dismissed, and that in the course of doing so, he had assaulted her. Heather Allin asked her to come in and complete an affidavit concerning the event, which she did. Heather Allin met with her and talked with her about the incident and subsequent events. The affidavit that the victim completed describes an assault that took place in November 2001 in conjunction with an effort by Mr. Millette to get the victim to retract her statements about his conduct that led to his conviction. It does not address the reason for any delay between November and March in reporting the incident. It appears that the victim told Heather Allin that the reason she called to report it in March was that she had heard from a friend that Mr. Millette, while at a restaurant, asked the friend questions about the victim, but no more of the conversation than that can be determined from the evidence. Heather Allin showed the affidavit to her supervisor, Debby Thibault, and described her conversation with the victim. Heather Allin and her supervisor decided to suspend Mr. Millette's furlough and conduct a case staffing meeting under the new emergency rule.

On March 12, 2002, the next day, Scott Millette was at his IDAP program group session. He was taken out of the group by corrections officers, who took him to meet with Heather Allin. She handed him a Notice of Furlough Suspension and informed him that she had information that he had had unauthorized contact with his victim and that it had involved an assault. That is the extent of what she told him. She did not show him the affidavit, or describe its contents, or tell him that she understood that he had been asking a third party about the victim. She did not ask

---

[4] According to the Emergency Rule, "classification" refers to "the process of determining the appropriate level of supervision, institution, job, programs and services to meet the offender's needs . . . . " Emergency Rule, Offender Classification at 2. The Rule goes on to explain that the purpose of offender classification is to: 1) ensure internal management of correctional facilities; and 2) prepare offenders for their return to the community as law abiding citizens. Id. at 4.

him whether he admitted or denied it. She understood that he had already denied doing anything wrong to the officers who took him out of group. She did not ask him for his explanation of the allegation. His furlough was suspended, and the corrections officers took him to the Chittenden Community Correctional Center, where he was lodged. He has remained there since. A case staffing meeting was scheduled to take place on March 14, 2002.

The following day, March 13, 2002, his IDAP group facilitator Kristin Prior met with him in jail to do an assessment for purposes of classifying him for purposes of future management of his case. She told him that there was an allegation that he had had contact with his victim, and had assaulted her, and that there was a possibility that there would be new charges arising from this new allegation. He told her that he had not had contact with his victim while on PAF or assaulted her. He admitted that he had inquired about her to a friend of hers at a restaurant, and had made nasty comments about her. Kristin Prior did not ask him what questions he asked the friend about the victim, or how his conversation with the friend had come about. She was concerned about the fact that he had sought any information about the victim, since Mr. Millette had been in the IDAP program since October, and knew he was supposed to bring up in group any risk behavior concerning his victim. She returned to the office and informed both Debby Thibault and Heather Allin that Mr. Millette denied contacting or assaulting his victim, but admitted that he had talked to a third party about her and had made nasty comments about her.

The morning of March 14th, the IDAP treatment team met, and developed a recommendation, to be presented at the case staffing meeting, that Mr. Millette be given a 15 day graduated sanction.

The case staffing meeting was held at 2:30 p.m. that afternoon, on March 14th. Heather Allin distributed a Case Staffing Review Sheet. It contained her written explanation of the allegation, as well as a copy of the victim's affidavit. In Heather Allin's narrative, she stated that the victim had told Heather Allin that the reason she (the victim) had called recently, four months after the alleged incident and not before, was that she had heard from a friend that Mr. Millette had asked about her, and she was concerned. The friend was not identified, nor were the circumstances of Mr. Millette's contact with the friend or his statements to the friend.

Present at the case staffing were Heather Allin, her supervisor Debby Thibault, Director of Classification for the DOC Ray Flum, Superintendent of the Chittenden Community Correctional Center Susan Underwiser, and Supervisor of DOC Officers Mike Touchette. Scott Millette was not present, and had not been invited to be present. The allegations and the case and the recommendation from the IDAP treatment team for a graduated sanction were discussed. None of the staff members present had actually talked with Scott Millette about either the alleged assault or Mr. Millette's conversation with a third party about the victim.

It was decided at the case staffing meeting to reject the recommendation of the IDAP treatment team, and classify Mr. Millette for treatment and management in prison. Important factors in reaching this decision were that Mr. Millette's conviction had been for second degree

-5-

assault and that the team expected that there would be new assault charges against Mr. Millette arising from the November incident. A factor that the team decided made the allegations believable was that at about the time the conduct is alleged to have occurred, Mr. Millette was saying in group that he expected his case to go away. Another important factor was that it was a third party who had reported to the victim that Mr. Millette had asked about her recently. Another factor was that Mr. Millette had participated in the IDAP group for several months without ever having brought up anything related to the conduct newly alleged, and that after so many months in group, he was nonetheless going to an outside source to try to find his victim, which he should have known was contrary to everything he should have been learning in IDAP. The staff members concluded that because of risk to the victim and indications that the IDAP program was not effective for Mr. Millette, a new plan would be developed for treatment within corrections facilities.

As a consequence of the meeting, Mr. Millette has remained incarcerated in prison. No formal statement of furlough revocation was ever prepared or given to him, although both Mr. Millette and DOC personnel understand that his furlough was revoked. His life is the institutional one of serving a sentence "on the inside." He does not work. When his daughter visits him, interaction is strained and physical contact is restricted: he is allowed to give her one hug when she leaves. Telephone calls are restricted to approved persons, and calls are recorded. As of the completion of the hearing on May 15, 2002, no new charges had been filed against him.

On April 9, 2002, Mr. Millette filed a petition for a writ of habeas corpus with this court, asking the court to inquire into the legality of his present confinement within the correctional facility. He does not dispute that he is serving a sentence and in the custody of the Commissioner of the Department of Corrections. He alleges that the mittimus sentenced him to serve his sentence on preapproved furlough, and that he was entitled to a hearing prior to the revocation of his furlough status. He claims that extended incarceration within a prison facility is unlawful because it came about without the due process protection of a hearing prior to the making of the furlough revocation decision. Alternatively, he claims that the Emergency Rule is not properly in place pursuant to the requirements of the APA and is invalid, and thus he is entitled to the procedural protections in place prior to the effective date of the Emergency Rule.

## Conclusions of Law

It is not the function of this court to decide the merits of whether Mr. Millette's conduct does or does not support a furlough revocation decision. The legal question before the court is whether an offender who has been sentenced to serve a sentence on preapproved furlough, as stated on the mittimus, is entitled to a hearing prior to the revocation of that furlough as a matter of due process under the United States or Vermont constitutions. Petitioner argues that he has a liberty interest in furlough, and that due process requires a 601 type of hearing prior to revocation. The Department argues that because Petitioner is an inmate under sentence in the

-6-

custody of the Commissioner, there is no liberty interest, or to the extent the court determines that there is, due process is satisfied by the holding of a case staffing meeting. This court holds that the Petitioner as an inmate on preapproved furlough pursuant to a mittimus is entitled to the procedural protections of a 601 hearing prior to the revocation of furlough, for the reasons stated herein.

"Courts 'examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" Conway v. Gorczyk, 171 Vt. 374, 376 (2000) (Conway II) (quoting Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989)).

I.

To analyze whether a state has created a liberty interest protected by the Due Process Clause in the context of programs providing for release of prisoners under sentence, the United States Supreme Court focuses on the nature of the interest created by the state. Morrissey v. Brewer, 408 U.S. 471 (1972); Sandin v. Conner, 515 U.S. 472 (1995); Young v. Harper, 520 U.S. 143 (1997). This calls for a description of the preapproved furlough program under state law.

Authorization for furlough of inmates is established under 28 V.S.A. § 808. In 28 V.S.A. § 808(a), the circumstances are defined under which the Commissioner of the Department of Corrections "may extend the limits of the place of confinement of an inmate at any correctional facility." Before June of 2001, the statute set forth six circumstances under which furlough was authorized. The first five were narrowly defined (to visit a critically ill relative, to attend a funeral of a relative, to obtain medical services, to find a residence for use upon discharge, and to contact prospective employers), while (6) was a catchall: "[f]or any other reason consistent with the rehabilitation of the inmate." For several years prior to 2001, many inmates were supervised on furlough under the authority of the sixth category. Some had served a portion of their sentences in prison and were furloughed from prison for rehabilitative purposes while relieving prison overcrowding. Others, like Mr. Millette, qualified for rehabilitative programs and furlough supervision even before entering a plea, so that their sentence was intended from the time of conviction to be served on furlough, and they were so sentenced by the court. Furlough revocation 601 hearings were held prior to furlough revocation in the same way for all furloughees, regardless of whether the inmate had been furloughed from prison or was on preapproved furlough status.

In 2001, the Legislature amended 28 V.S.A. § 808, thereby changing the Commissioner's authority with respect to furlough programs. Category (6) was eliminated, thereby ending the broad authority previously available to the Commissioner to furlough an inmate for "any other reason consistent with the rehabilitation of the inmate." It was replaced by two new categories.

The amended sixth category authorizes a Conditional Reentry Furlough Program, for reintegration of inmates from prison into the community, but requires that inmates complete serving their minimum term of sentence before being eligible for the program. The new seventh category specifically authorizes Preapproved Furlough approved by a court at time of sentencing so that an inmate does not enter a correctional facility when the sentence commences, but serves the sentence "on the outside" as long as the restrictions and requirements of furlough are observed, including requirements to engage in rehabilitative programming and to work:

> [t]he department may authorize furlough for any of the following reasons: . . . (7) When recommended by the department and ordered by a court. The inmate may be sentenced to serve a term of imprisonment but placed by a court on furlough to participate in such programs administered by the department in the community that reduce the offender's risk to reoffend or that provide reparation to the community in the form of supervised work activities.

28 V.S.A. § 808(a)(7). From the time the amendment became effective in June of 2001 until the Department promulgated its Emergency Rule on March 2, 2002, the Department continued to provide 601 hearings to all furloughees prior to revocation of furlough status, whether the inmate was on Conditional Reentry or Preapproved Furlough status.

The court concludes that by establishing the Preapproved Furlough Program under which Petitioner was sentenced, the state created a program in which an inmate on PAF has a reasonable expectation of being able to serve his sentence outside prison walls as long as he meets furlough and program conditions and requirements.[5] In 1997 in Young v. Harper, the United State Supreme Court analyzed whether an inmate serving a sentence outside prison walls on Oklahoma's Preparole Conditional Supervision Program held a liberty interest entitling the inmate to the procedural protections as set forth in Morrissey v. Brewer before he could be removed from the program and required to serve his sentence in prison.[6] Young v. Harper, 520 U.S. 143, 152-153 (1997). The Court in Young examined the nature of the program, and concluded that the state had created a liberty interest in the program entitling an inmate to the protections of Morrissey. Id. It is difficult to distinguish the characteristics of the PAF program

---

[5]There is an exception for immediate suspension. Because 28 V.S.A. §808(d) authorizes immediate suspension, and this is written into the terms and conditions of the furlough agreement reviewed and signed by the inmate prior to acceptance into the program, the liberty interest in furlough is qualified by the authority of the Commissioner to effect an immediate suspension of furlough for a brief period. The analysis here applies to the change in status, following immediate suspension, from serving a sentence on furlough to serving it within prison.

[6]In Morrissey, the Court held that a parolee maintained a liberty interest in his parole status such that his parole could not be revoked without an administrative hearing with minimum procedural protections. Morrissey v. Brewer, 408 U.S. 471, 482 (1972).

-8-

from those of the Preparole Conditional Supervision Program analyzed by the Court in Young. See generally, id. at 148-151.

In Vermont, as was the case in Oklahoma, there is a separate parole program in addition to the preparole program, so it cannot be argued that the Morrissey protections apply only to parole and not to a preparole release program. A PAF inmate like Petitioner, while living under restrictions on daily life, lives under conditions like those in the Oklahoma program, meaning "a life generally free of the incidents of imprisonment." Id. at 148. The types of restrictions are virtually indistinguishable from each other and from those in Morrissey: the inmate is employed, lives with family and sees friends, and is not confined within prison walls. See id.; Morrissey, 408 U.S. at 478. There is an implicit promise that his ability to serve his sentence on the outside will end only if he fails to live up to the conditions of the program. See Young, 520 U.S. at 148; Morrissey, 408 U.S. at 479. There are restrictions on travel and conduct, and a requirement to report regularly to a supervising officer. See Young, 520 U.S. at 148; Morrissey, 408 U.S. at 478. The primary difference is that under the Oklahoma program, an inmate could be placed on preparole only after serving 15% of his sentence.

The preapproved furlough statute in Vermont specifically authorizes judges at sentencing to place the inmate on furlough status: "[t]he inmate may be sentenced to serve a term of imprisonment but placed by a court on furlough . . . " 28 V.S.A. § 808(a)(7). The fact that this furlough status is available from the beginning of a sentence creates a powerful incentive for accused persons to admit responsibility for their criminal conduct and voluntarily participate in rehabilitative programming while maintaining safe conduct and maintain employment in the community, as their freedom from confinement depends on it. The trade-off for this incentive is the promise that the furlough status will continue as long as the inmate lives up to the requirements of the program. This promise is not wholly unwritten, as the Commissioner is specifically ordered on the mittimus to supervise the inmate on furlough status. Thus, from the moment of sentencing, the Commissioner does not have the authority to exercise complete discretion to place the inmate behind prison walls, but is ordered by the court to place the inmate on furlough. Thus an inmate has no reason to believe that his or her furlough status can be altered by a change of mind on the Commissioner's part, and good reason to believe that revocation of furlough status requires a factual determination of whether there has been a violation of the furlough and program agreements.

In addition, in this case, when Petitioner signed the IDAP and PFA agreements and qualified for PAF, and entered his plea accordingly in September of 2001, written procedures were in place for 601 hearings for furlough revocation. He had good reason to believe that he could not be removed from the program and required to serve his sentence in prison based on a discretionary decision of the Commissioner or his designee, and his counsel would have so advised him. Thus the bargain he made at the time included the reasonable expectation that furlough would not be revoked without a 601 hearing at which it would be determined whether or not he had violated furlough program requirements.

-9-

Accordingly, the court concludes that Petitioner, as an inmate on preapproved furlough, held a liberty interest created by the state which was protected by the Due Process Clause.[7]

The Department argues that the Vermont Supreme Court has ruled that an inmate has no liberty interest in furlough as it exists under Vermont law. The Commissioner cites Conway v. Cumming, 161 Vt. 113(1993)("Conway I"), Parker v. Gorczyk, 170 Vt. 263 (1999), Conway v. Gorczyk, 171 Vt. 374 (2000)("Conway II"), and State v. Greene, 12 Vt. L. Wk. 237 (2001).

In Conway I, the Vermont Supreme Court held that the inmate's due process right had not been violated when his furlough was revoked without a hearing. Conway I, 161 Vt. at 116. The Court compared the inmate's interest with that of a parolee under Morrissey, and held that "plaintiff's status under furlough more closely resembles that of an inmate seeking a particular right or status within an institution, rather than that of a parolee." Id. There are differences in both fact and law that make the holding in Conway I inapplicable to the current case. First, the governing statute, 28 V.S.A. § 808 has been amended since 1993, as described above, to create a special class of preapproved furloughees, of which Mr. Millette is a member, in which the inmate's status as furloughee, living in the community, is determined at sentencing by a judge

_____

[7]The decision of Sandin v.Conner is not pertinent to the analysis, as it addressed the issue of liberty interests of inmates within the prison environment, created by prison regulations. This issue is distinct from the analysis of whether a liberty interest is created in connection with statutory programs in which an inmate serves a portion of a sentence outside prison and may be subject to removal from the community to prison. Nonetheless, even if the standard in Sandin is applied, the analysis still produces a conclusion that a PAF furloughee holds a protected liberty interest.

In Sandin, the issue was whether a transfer to disciplinary segregation, within a prison setting, triggered a liberty interest. Id. at 475. According to the Court, state-created liberty interests protected by the Due Process Clause "will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484 (internal citations omitted). Because in Sandin the disciplinary segregation "was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life," the Court found that neither the state regulation nor the Due Process Clause itself afforded the inmate a liberty interest which would entitle him to procedural protections under the Due Process Clause. Id. at 487.

In Mr. Millette's case however, because his preapproved furlough status enabled him to serve his entire sentence outside of the prison walls, State action to revoke his furlough and mandate incarceration constitutes a serious disruption in his environment. As discussed in the context of the programs found in Young and Morrissey, the mere fact of incarceration constitutes a profound distinction between those serving sentences on the outside and those serving them in prison. For Mr. Millette, a change to remove him from the community to prison is a change in 'prison life' that imposes an "atypical and significant hardship" such that prior to furlough revocation and incarceration he is first entitled to at least some procedural protections afforded by the Due Process Clause.

-10-

and included on the mittimus. A preapproved furloughee serves his sentence from the beginning while living in the community on a status ordered by the court. Unlike the petitioner in Conway I, a preapproved furloughee has never served time within prison. Second, Young v. Harper has been decided subsequent to the Court's decision in Conway I, and has established that an inmate on a preparole program has a liberty interest requiring Morrissey protections under the Due Process Clause, even where a separate parole program exists. Thus, the holding from Conway I upon which the Department relies is not controlling law as applied to the facts of this case.

In Parker, the Court considered whether inmates were entitled under the Vermont Constitution to individualized assessments of their furlough eligibility prior to expiration of their minimum sentences. Parker, 170 Vt. at 266. The Court relied on due process jurisprudence of the United States Supreme Court in its analysis. Id. at 272. In reviewing whether due process was implicated by the lack of individualized furlough assessments, the Court concluded that the plaintiffs, as incarcerated prisoners, did not have a right to freedom from confinement during the period of their lawful sentences, and that anticipation of furlough did not constitute a protected interest. Id. at 272. The Court distinguished the Parker plaintiffs' interest in liberty from that of furloughees with respect to due process protection, quoting Judge Friendly: "'there is a human difference between losing what one has and not getting what one wants.'" Id. at 274. (quoting H. Friendly, Some Kind of Hearing, 123 U. Pa. L. Rev. 1267, 1296 (1975)). It further distinguished the nature of the decisions in the two types of cases: "[u]nlike revocation decisions, which most often turn on factual questions such as whether an inmate's misconduct violated conditions of release, release decisions [decisions to put an inmate from prison out on furlough in the community] involve a discretionary assessment of a multitude of factors that require subjective appraisals." Id. at 275.

Although the Court noted these distinctions, it specifically declined to address the issue as it related to furlough revocation, and decided only the case before it. Therefore, the decision does not constitute a ruling on the issue presently before this court. Indeed, the Court's comments as they relate to furlough revocation are consistent with the ruling here that a person who has never served any portion of his sentence inside prison has a liberty interest protected by the Due Process Clause.[8] Furthermore, the comments are consistent with the ruling here that due process requires a hearing in order to obtain a factual determination of whether the inmate's conduct constituted a violation of the conditions of furlough.

Although the Department argues that State v. Greene, 12 Vt. L. Wk. 237 (2001) resolves the question of whether revocation of preapproved furlough requires a hearing, the issue in that case was not whether there is a liberty interest in furlough, and the case did not involve any

---

[8] Consistent with this reasoning is the Court's holding in Conway v. Gorczyk (Conway II), 171 Vt. 374, 380 (2000) (whether petitioner would actually earn good-time credits was speculative; thus the interest is diminished because he is not losing something he already has). Had Mr. Millette been arguing from prison for the right to furlough as opposed to the right to maintain his preapproved furlough status, the significance of his interest would be diminished.

-11-

analysis related to liberty interests or due process protections. Rather, <u>Greene</u> is limited by its facts, which involve only the question of whether the defendant's second mittimus was inconsistent with either his plea agreement or first mittimus. Although there is language in <u>Greene</u> upon which the Department would like to rely ("Furlough, preapproved or not, can be revoked at the discretion of the corrections department and does not require a hearing before the parole board (unlike SCS)." <u>Greene,</u> 12 Vt. L. Wk. at 238), the language is dictum and not related to the holding in the case. Indeed, the mittimus involved in the case specifically provided that the inmate was to commence serving the sentence in a correctional facility, unlike this case, in which Mr. Millette's furlough status was ordered by the court on the mittimus. Contrary to the arguments of the Department, <u>Greene</u> does not stand for the proposition that furlough, pre-approved or not, can be revoked at any time and under any circumstance without a hearing.

The court concludes that based on the nature of the preapproved furlough program, and the decisions of <u>Morrissey</u> and <u>Young v. Harper</u>, the state has created, by statute, a liberty interest for inmates on PAF status entitling them to procedural due process before that status can be revoked on more than a temporary basis.

## II.

The Department argues that even if Petitioner holds a liberty interest in PAF, the requirements of the Due Process Clause are satisfied by the holding of a case staffing meeting of the type held for Mr. Millette. The holding of <u>Young v. Harper</u> is clear: "We conclude that the Program, as it existed when respondent was released, was a kind of parole as we understood parole in <u>Morrissey</u>. The judgment of the Tenth Circuit is therefore affirmed." <u>Young v. Harper</u> at 153. The Tenth Circuit had ruled that the preparole program "'more closely resembles parole or probation than even the more permissive forms of institutional confinement' and that '[d]ue process therefore mandates that program participants receive at least the procedural protections described in <u>Morrissey</u>.'" <u>Id</u>. at 146. Therefore, the elements of due process set forth in <u>Morrissey</u> establish the due process requirements for removal of an inmate from preapproved furlough for a period longer than immediate suspension.

A case staffing meeting falls far short of meeting those requirements. Petitioner is not permitted to be present at a case staffing meeting. A fundamental principle of <u>Morrissey</u> was that a factual determination, i.e., whether the inmate violated parole conditions or not, was the cornerstone of whether the inmate's liberty could be revoked, and dictated the purpose of the hearing. As stated in <u>Morrissey</u>, "[t]he hearing is to determine the fact of parole violation." <u>Morrissey</u>, 408 U.S. at 499. By contrast, the evidence in this case shows that the purpose of a case staffing meeting under the new procedure is not to make a factual determination about whether or not there was actually a violation, but to determine how to classify, manage, and treat the inmate. Petitioner had no opportunity to review the material used by the staff members in making their determination, and no opportunity to present evidence and argument on his own behalf. No determination was made following the case staffing meeting showing the basis for

the revocation decision. In fact, it appears that no formal revocation decision was actually made at all. Mr. Millette was simply shifted to a plan for management of his case in prison without having been given the basis for a determination that he had failed to comply with furlough requirements.

By contrast, the 601 hearings provided by the Department prior to March 2, 2002 had all the hallmarks of due process as required by Morrissey and Young. A comparison of the elements identified in Morrissey as minimum procedural protections with the Directive in place since 1996 establishing the procedural requirements for 601 hearings shows a remarkable similarity. In addition, since those were the protections in effect at the time Petitioner entered his plea, his reasonable expectation of liberty included the reasonable expectation that his furlough status would not be revoked without the panoply of protections specifically in place at that time for a 601 hearing. Therefore, the court concludes that prior to revocation of his preapproved furlough status, Petitioner is entitled, under the Due Process Clause of the United States Constitution, to a hearing with all of the procedural protections of a 601 hearing.

## Summary

The court concludes that Mr. Millette maintains a liberty interest in his preapproved furlough as included in the mittimus establishing his sentence, and that he is entitled to the due process protections set forth in Morrissey and in the Department's procedures for a 601 hearing prior to a decision to revoke his preapproved furlough. Because this ruling is based upon the due process clause of the United States Constitution, there is no need to address Petitioner's alternative argument that the terms of the Emergency Rule that went into effect on March 2, 2002, are invalid and inapplicable, or the Department's response that such a claim can only be raised in the context of a Rule 75 Review of Governmental Action complaint.

Even on preapproved furlough status, Petitioner is an inmate serving a sentence while in the custody of the Commissioner of the Department of Corrections. Appropriate relief is therefore not to release him from the Commissioner's custody, but to provide the opportunity for a 601 hearing so that the necessary factual determinations can be made to determine whether he has failed to comply with program and furlough conditions.

-13-

## ORDER

The Commissioner shall not confine Petitioner to serve his sentence at a correctional facility unless, after a brief period of immediate suspension, a decision is made to revoke his furlough status in accordance with the furlough revocation procedures of a 601 hearing.

Dated at Burlington, Vermont, this __19__ day of June, 2002.

Hon. Mary Miles Teachout
Superior Court Judge

Hon. Thomas M. Crowley
Assistant Judge

-14-